Fee Paid

**F I L E D**
CLERK, U.S. DISTRICT COURT

7/28/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____RYO_____ DEPUTY

**ORIGINAL**

Michael A. Hirst (CA Bar No. 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal (CA Bar No. 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, CA 95616
Telephone: (530) 756-7700
Facsimile: (530) 756-7707

NOCV30
N/S

Counsel for Plaintiff-Relators
Sunil Wadhwa and Emily Prins

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF ILLINOIS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF TENNESSEE, AND STATE OF TEXAS <u>ex rel.</u> SUNIL WADHWA and EMILY PRINS, <br><br>Plaintiffs, <br><br>v. <br><br>PROGRESS MEDICAL LLC; AMNIO TECHNOLOGY, LLC; BIOLAB SCIENCES, INC.; BIOLAB HOLDINGS, INC.; BLS LABS, LLC; BIOSTEM TECHNOLOGIES, INC.; DIRECT BIOLOGICS, INC. f/k/a DIRECT BIOLOGICS, LLC; HEALTHTECH WOUND CARE, INC.; LEGACY MEDICAL CONSULTANTS, LP; MLM BIOLOGICS, INC.; PINNACLE TRANSPLANT TECHNOLOGIES, LLC; PRECISE BIOSCIENCE CORPORATION; REDDRESS USA, INC.; ROYAL BIOLOGICS, INC.; SAMARITAN BIOLOGICS LLC; STRATUS BIOSYSTEMS, LLC d/b/a CELLGENUITY REGENERATIVE SCIENCE; SURGENEX, LLC; XTANT MEDICAL HOLDINGS, INC.; BLS SALES AND MARKETING, LLC; WORLD REACH HEALTH, LLC; VENTURE MEDICAL LLC; AND DOES 1–20, <br><br>Defendants. | **Civil Action No:** <br><br>2:25-cv-07049-SVW(AGRx) <br><br><br>**COMPLAINT** <br><br>**JURY TRIAL DEMANDED** <br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

1

Complaint

## Table of Contents

**INTRODUCTION AND OVERVIEW OF THE FRAUD** ...................................4

**JURISDICTION AND VENUE** ................................................................7

**PARTIES** .........................................................................................8

    A.    Laboratories ...............................................................8

    B.    Third-Party Marketers .................................................11

    C.    Doe Defendants ..........................................................11

**RELEVANT HEALTH CARE PROGRAMS AND BILLING REQUIREMENTS** ...............................................................12

    A.    Medicare and Medicaid Programs Generally .....................12

    B.    Medicare Requirements Relating to CTPs ........................14

    C.    TRICARE ................................................................17

    D.    Other Federal Health Care Programs ...............................18

    E.    Commercial Insurers ...................................................18

**APPLICABLE LAW** ...........................................................................19

    A.    The Federal and State Anti-Kickback Statutes ..................19

    B.    Eliminating Kickbacks in Recovery Act Of 2018 ..............23

    C.    The Federal and State False Claims Acts ..........................24

    D.    The California Insurance Frauds Prevention Act .................25

    E.    The Illinois Insurance Claims Fraud Prevention Act ...........27

**THE FRAUD SCHEMES** ......................................................................29

    I.    LABORATORIES ......................................................29

    A.    Amnio Technology LLC ..............................................30

    B.    BioLab Sciences, Inc., BioLab Holdings, Inc., and BLS Labs, LLC .31

    C.    BioStem Technologies, Inc. and Direct Biologics, Inc. .......33

    D.    HealthTech Wound Care, Inc. .......................................34

    E.    Legacy Medical Consultants, LP ...................................35

    F.    MLM Biologics, Inc. ..................................................36

2

Complaint

G.    Pinnacle Transplant Technologies, LLC ............................................37

H.    Precise Bioscience Corporation ........................................................39

I.    RedDress USA, Inc. ..........................................................................40

J.    Royal Biologics, Inc. ........................................................................41

K.    Samaritan Biologics LLC ..................................................................42

L.    Stratus Biosystems, LLC d/b/a CellGenuity Regenerative Science ...43

M.    Surgenex, LLC ..................................................................................44

N.    Xtant Medical Holdings, Inc. ............................................................45

II.    THIRD-PARTY MARKETERS ............................................................46

A.    Progress Medical LLC ......................................................................46

B.    BLS Sales and Marketing, LLC ........................................................52

C.    World Reach Health, LLC ................................................................53

D.    Venture Medical LLC ......................................................................54

**CAUSES OF ACTION** .....................................................................................55

**PRAYER FOR RELIEF** ...................................................................................96

**DEMAND FOR JURY TRIAL** .........................................................................97

3

Complaint

Through their undersigned attorneys, Plaintiff-Relators Sunil Wadhwa ("Wadhwa") and Emily Prins ("Prins") (collectively "Relators"), on behalf of the United States of America ("United States"), the States of California, Colorado, Delaware, Florida, Illinois, Michigan, Minnesota, Montana, New Mexico, New York, Tennessee, and Texas (collectively the "States"), and commercial insurers, in their Complaint against Defendants Amnio Technology, LLC, BioLab Sciences, Inc., BioLab Holdings, Inc., BLS Labs, LLC, BioStem Technologies, Inc., Direct Biologics, Inc. f/k/a Direct Biologics, LLC, HealthTech Wound Care, Inc., Legacy Medical Consultants, LP, MLM Biologics, Inc., Pinnacle Transplant Technologies, LLC, Precise Bioscience Corporation, RedDress USA, Inc., Royal Biologics, Inc., Samaritan Biologics LLC, Stratus Biosystems, LLC d/b/a CellGenuity Regenerative Science, Surgenex, LLC, and Xtant Medical Holdings, Inc. (collectively "Laboratories" or "Laboratory Defendants"); and Progress Medical LLC, BLS Sales and Marketing, LLC, World Reach Health, LLC, and Venture Medical LLC (collectively "Third-Party Marketers" or "TPMs" or "Third Party Marketer Defendants") (unless otherwise indicated, collectively "Defendants"), allege as follows:

## **INTRODUCTION AND OVERVIEW OF THE FRAUD**

1. In recent years, spending on medical care for wound treatment involving human cells, tissues, or cellular or tissue-based products ("CTPs") has skyrocketed to over $10 billion per year and continues to rise, with Medicare paying approximately $2.3 billion for CTPs between April and July 2025.[1] Government payors and commercial insurers have experienced a striking rise in costs. Unfortunately, fraud has fueled this surge. Specifically, fraudsters have discovered

---

[1] THE NEW YORK TIMES, *Trump Administration Will Limit Medicare Spending on Pricey Bandages* (Jul. 15, 2025), available at https://www.nytimes.com/2025/07/15/health/medicare-skin-substitutes-prices.html.

4

Complaint

that sales of single-use substitute skin products for grafting procedures is a lucrative field and an illegal but effective method to obtain substantial revenues to which the fraudsters are not entitled.

2.      The costs to payors have increased dramatically year after year. For Membrane Wrap alone -- manufactured by BLS Labs, LLC, a Laboratory Defendant -- Medicare paid out nearly $17 million from 2020 to 2022. From 2022 to 2023, the number of services increased from approximately 16,000 to 107,000, the average payment per service increased  from $294 to $1,163, and the number of providers billing the CTP increased from 8 to 64. For 2023 alone, Medicare paid just under $124 million for Membrane Wrap, one of the 18 products at issue in the case. As discussed below, that revenue was generated by Defendants' illegal compensation schemes.

3.      In addition to regulatory changes, the United States has also sought criminal charges against fraudsters utilizing CTPs. On July 16, 2025, the U.S. Attorney's Office for the District of Nevada announced[2] a provider's guilty plea to conspiring to receive kickbacks and to defrauding Medicare by billing medically unnecessary skin grafts with CTPs. As part of the plea agreement, the provider is cooperating in the United States' ongoing investigation of her co-conspirators, including a marketing company and a CTP manufacturer, each of which allegedly paid kickbacks to the provider as inducement to purchase the CTPs and subsequently bill Medicare. *United States v. Huntly*, case no. 2:25-cr-00183 JCM-DJA, Dkt. No. 6 (Plea Agreement), ECF 8–10 (Dist. Nev. Jul. 16, 2025).

4.      Generally, CTPs are biological products containing protein, hormones or enzymes seeded into a matrix which may provide protein or growth factors

---

[2] UNITED STATES ATTORNEY'S OFFICE, District of Nevada, *Nevada Nurse Practitioner Pleads Guilty To Fraudulent Medicare Wound Care Billing* (Jul. 16, 2025), https://www.justice.gov/usao-nv/pr/nevada-nurse-practitioner-pleads-guilty-fraudulent-medicare-wound-care-billing.

Complaint

proposed to stimulate or facilitate healing or promote epithelization. Different types of CTPs are created using donated human skin, derived from human tissue samples, or developed using xenogeneic collagen or tissue.

5. CTPs such as the products discussed herein are intended to be used in place of traditional wound dressings and are applied using substantially similar methods.

6. This is an action to recover damages and civil penalties on behalf of the United States, the States (collectively the "Government"), and commercial insurers, arising from Defendants' conduct in submitting false claims for these skin grafts. Defendants are knowingly submitting false and fraudulent claims; knowingly making, using, or causing to be made or used false and fraudulent statements and records material to those false claims; knowingly concealing and avoiding Defendants' obligation to return payments obtained through the false claims; and conspiring together to violate the False Claims Act, 31 U.S.C. § 3729, *et seq.*, each of the state False Claims Acts (collectively the "FCAs"), *infra*, the California Insurance Frauds Prevention Act ("IFPA"), and the Illinois Insurance Claims Fraud Prevention Act ("ICFPA").

7. Specifically, the Laboratories and their Third-Party Marketers have knowingly and willfully failed, and continue to fail, to comply with the requirements of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), and its state equivalents, and the Eliminating Kickbacks in Recovery Act of 2018, Pub. L. 115-271, 18 U.S.C. § 220 ("EKRA"), by offering and receiving commission-based payments to induce referrals of CTP services. These commission payments illegally vary with the volume and value of the referrals and sales they generate.

8. Numerous third-party marketers have participated in this fraudulent conduct with the Laboratories. Together, these parties have caused significant losses to the Government and commercial insurers through unreasonable and unnecessary

6

Complaint

use of CTPs.

9.     Defendants' fraud has caused such losses to government and commercial insurers since at least 2018 and continuing to the present. Defendant Laboratories illegally pay commissions to Defendant Third-Party Marketers to induce physicians to purchase Defendant Laboratories' CTPs with the expectation that such costs will be billed to government and commercial payors.

10.    The Defendants aggressively and illegally market CTPs by knowingly and willfully violating the AKS, EKRA, California IFPA, Illinois ICFPA, and the FCAs, as described herein, in spite of industry-wide knowledge of AKS' and EKRA's criminalization of such compensation structures.

11.    Although Defendants understand the payment and billing requirements for CTPs, and understand that these requirements are material to the Government's payment decisions, each Laboratory Defendant continues to knowingly submit false and fraudulent claims for services, and continues to make illegal payments to the TPM Defendants in violation of law, including AKS, EKRA, California IFPA, Illinois ICFPA, and the FCAs.  Similarly, each of the TPM Defendants is also aware of these violations, yet each of them continues to solicit and receive illegal commissions from the Defendant Laboratories.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13.    Although the issue is no longer jurisdictional under the 2010 amendments to the FCA, to Relators' knowledge, there has been no public disclosure of the "allegations or transactions" in this Complaint, as that term is used in 31 U.S.C. § 3730(e). Moreover, whether or not such a disclosure has occurred, Relators

7

Complaint

qualify under the FCA as "original sources" pursuant to 31 U.S.C. § 3730(e)(4). Before filing this action, Relators voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based. Additionally, Relators have knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may have occurred without Relators' knowledge.

14.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process.  Moreover, venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because one or more Defendants can be found in this district, continue to transact business in this district, and/or because the violations alleged herein occurred within this district.

## PARTIES

15.    Plaintiff-Relator Sunil Wadhwa is a resident of El Dorado Hills, California.  Mr. Wadhwa is the Co-founder and Chief Executive Officer of MedXPrime Revenue Recovery, a medical billing company. MedXPrime Revenue Recovery provides billing services to medical providers, including assistance with administrative appeals for Medicare and Medicaid coverage denials.

16.    Plaintiff-Relator Emily Prins is a resident of El Dorado Hills, California. Ms. Prins is an Operations Manager and Partner at MedXPrime Revenue Recovery.

### A.    Laboratories

17.    Defendant Amnio Technology, LLC is a Delaware corporation headquartered in Phoenix, Arizona. Among other products, it is responsible for manufacturing PalinGen Membrane, a CTP.

18.    Defendant BioLab Sciences, Inc. is a Delaware corporation headquartered in Arizona. Among other products, it developed the patent for the

8

Complaint

process to manufacture Membrane Wrap and Membrane Wrap-Hydro, which are CTPs. It operates a laboratory in Scottsdale, Arizona.

19. Defendant BioLab Holdings, Inc. is a Delaware corporation headquartered in Arizona. It is the parent company of BLS Labs, LLC and BLS Sales and Marketing, LLC. BioLab Holdings, Inc. is also the co-owner (with BLS Sales and Marketing, LLC) of a California Tissue Bank License issued by the California Department of Public Health. BioLab Holdings, Inc. also operates the website www.biolabsciences.net, which is the operating website for BLS Sales and Marketing, LLC.

20. Defendant BLS Labs, LLC is a Delaware corporation headquartered in Mesa, Arizona. BLS Labs, LLC is a wholly owned subsidiary of BioLab Holdings, Inc. BLS Labs, LLC licenses BioLab Sciences, Inc.'s process to manufacture Membrane Wrap and Membrane Wrap-Hydro.

21. Defendant BioStem Technologies, Inc. is a Florida corporation headquartered in Pompano Beach, Florida. Among other products, it is responsible for manufacturing AmnioWrap$^2$ ("AmnioWrap Two"), a CTP.

22. Defendant Direct Biologics, Inc. f/k/a Direct Biologics, LLC is a Wyoming corporation headquartered in Austin, Texas. The company changed names as part of a merger with Good Works II in 2023. Among other products, it is the patent owner and licensor of the process to manufacture AminoWrap Two, a CTP.

23. Defendant HealthTech Wound Care, Inc. is a Utah corporation headquartered in Salt Lake City, Utah. Among other products, it is responsible for manufacturing DermaBind FM and DermaBind TL, which are CTPs.

24. Defendant Legacy Medical Consultants, LP is a Texas limited partnership headquartered in Fort Worth, Texas, and the successor in interest to Legacy Medical Consultants, LLC. Among other products, Legacy Medical Consultants, LP is responsible for manufacturing InnovaMatrix AC, Complete

9

Complaint

ACA, PalinGen Membrane, Impax, ORION Amniotic Membrane, SurGraft FT, and Zenith Membrane, all of which are CTPs.

25. Defendant MLM Biologics, Inc. is a Delaware corporation headquartered in Gainesville, Florida. Among other products, it is responsible for manufacturing bioConneKt, a CTP.

26. Defendant Pinnacle Transplant Technologies, LLC is an Arizona corporation headquartered in Phoenix, Arizona. Among other products, it is responsible for manufacturing Cocoon Membrane, a CTP.

27. Defendant Precise Bioscience, LLC is a South Dakota corporation headquartered in Dakota Dunes, South Dakota. Among other products, it is responsible for manufacturing XCell Amnio Matrix, a CTP.

28. Defendant RedDress USA, Inc. is a Delaware corporation headquartered in Ponte Vedra Beach, Florida. Among other products, it is responsible for manufacturing ActiGraft, a CTP.

29. Defendant Royal Biologics, Inc. is a New York corporation headquartered in Hackensack, New Jersey. Among other products, it is responsible for manufacturing Amnio-Maxx, a CTP.

30. Defendant Samaritan Biologics LLC is a Tennessee corporation headquartered in Cordova, Tennessee. Among other products, it is responsible for manufacturing Complete AA, Complete SL, and MOST, all of which are CTPs.

31. Defendant Stratus Biosystems, LLC d/b/a CellGenuity Regenerative Science is a corporation headquartered in Gravevine, Texas. Among other products, it is responsible for manufacturing AmnioAMP-MP, a CTP.

32. Defendant Surgenex, LLC is an Arizona corporation headquartered in Scottsdale, Arizona. It is the patent owner of and is responsible for manufacturing SurGraft FT, a CTP.

33. Defendant Xtant Medical Holdings, Inc. is a Delaware corporation

10

Complaint

headquartered in Belgrade, Montana. Among other products, it is responsible for manufacturing SimpliMax, a CTP.

### B.  Third-Party Marketers

34.  Defendant Progress Medical LLC ("Progress Medical") is a Colorado corporation headquartered in Englewood, Colorado. It is a marketing company that sells each of the CTPs identified herein.

35.  Defendant BLS Sales and Marketing, LLC is a Delaware corporation headquartered in Mesa, Arizona. BLS Sales and Marketing, LLC is a wholly owned subsidiary of BioLab Holdings, Inc. BLS Sales and Marketing, LLC is also the co-owner (with BioLab Holdings, Inc.) of a California Tissue Bank License issued by the California Department of Public Health. Among other products, BLS Sales and Marketing, LLC markets Membrane Wrap and Membrane Wrap-Hydro.

36.  Defendant World Reach Health, LLC is a Delaware corporation headquartered in Rolling Meadows, Illinois. It is also a subsidiary of World Reach Holdings, LLC. HealthTech Solutions Inc. (the parent company of HealthTech Wound Care, Inc.) acquired a 51% ownership interest in World Reach Holdings, LLC in 2023. Leading to or as a result of these corporate relationships, World Reach Health, LLC is the exclusive distributor of DermaBind FM and DermaBind TL, which are both manufactured by HealthTech Wound Care, Inc.

37.  Defendant Venture Medical LLC is a third-party marketing company headquartered in Missoula, Montana. Among other products, it markets AmnioWrap Two and Vendaje AC.

### C.  Doe Defendants

38.  The identities of all remaining Doe Defendants, including additional Laboratory Defendants and Third-Party Marketer Defendants, are presently unknown to Relators. All listed Defendants and such additional Doe Defendants served as contractors, agents, partners, and/or representatives of one another in the

11

Complaint

fraud, concealment, and submission of false and fraudulent claims, as well as the wrongful retention of overpayments, and were acting within the course, scope, and authority of such contract, agency, partnership, and/or representation for the conduct described herein. Each of the listed Defendants and Doe Defendants participated in the schemes to defraud, and did defraud, the United States, the States, and commercial insurers, for which they are jointly and severally liable.

## RELEVANT HEALTH CARE PROGRAMS AND BILLING REQUIREMENTS

39. Together, the following federal and state health care programs (collectively "Government health care programs"), and commercial insurers in California and Illinois, provide funds for CTPs provided to patients.

### A. Medicare and Medicaid Programs Generally

40. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the cost of certain health care services. *42 U.S.C §§1395, et seq*. Medicare is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"), a department of HHS. Entitlement to Medicare exists based on age, disability, and/or the presence of end-stage renal disease. *42 U.S.C. §§ 426, 426-1, 426A*.

41. The Medicare program consists of four parts: A, B, C, and D. Particularly relevant to the complaint is Part B, which covers outpatient care. Outpatient care includes physician and ancillary services, such as outpatient skin graft procedures, furnished by physicians and other providers and suppliers. *42 U.S.C. § 1395k*.

42. Medicare Part B only covers services that are reasonable and necessary for the diagnosis or treatment of an illness, and will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific

Complaint

illness or injury.

43. To obtain Medicare reimbursements, providers generally submit a claim form known as the CMS 1500. To obtain payments, a provider certifies that he or she understands that the claim will be paid from federal funds, and that any false claim may be prosecuted under applicable law. Furthermore, the provider certifies that all submitted claims comply with applicable Medicare regulations, including but not limited to, compliance with the AKS and EKRA.

44. Medicaid is a state and federal assistance program that covers medical expenses for low-income patients, including low-income residents of nursing facilities. *See 42 U.S.C. §§ 1390, et seq*. Funding for Medicaid is shared between the federal government and those states that participate in the program. States directly pay providers, and then obtain the federal contribution from accounts drawn on the United States Treasury. *42 C.F.R. §§ 430.0, et seq*. The federal government reimburses or pays approximately one-half of the Medicaid bill and the state pays the other half; the federal reimbursement is called the "federal financial participation" ("FFP"). Federal funding for the Medicaid Program includes support for Medicare Savings Programs which help qualifying Medicare beneficiaries pay Part A and B premiums, co-payments, co-insurance, and deductibles. The Medicare Savings Programs consist of the Qualified Medicare Beneficiary Program, *42 U.S.C. § 1396d(p)(1)*, the Specified Low-Income Medicare Beneficiary Program, *42 U.S.C. § 1396a(a)(10)(E)(iii)*, the Qualifying Individual Program, *42 U.S.C. § 1396a(a)(10)(E)(iv)*, and the Qualified Disabled and Working Individuals Program, *42 U.S.C. § 1396d(s)*. Medicaid may serve as the primary insurer, or in some instances as the secondary insurer (e.g., with Medicare or private insurance providing primary coverage). Medicaid sets forth minimum requirements for state Medicaid programs to meet to qualify for federal funding and each participating state adopts its own state plan and regulations governing the administration of the state's

Complaint

Medicaid program.

45.    Primary regulatory control of state Medicaid programs is left to the states.  Consequently, reimbursement procedures and amounts vary among the states.  FFP is calculated each fiscal year in accordance with a formula established under Title XIX, with FFP ranging from a low of 50% in federal funding to more than 75% in FFP, depending on a variety of factors including the relative wealth of the state and its population, and the total amount and kinds of Medicaid expenditures that are needed or expected.

46.    Each of the States herein administers its own Medicaid program, and those programs include coverage of CTPs. In addition, private insurers in California and Illinois include coverage for CTPs.

**B.    Medicare Requirements Relating to CTPs**

47.    Healthcare Common Procedure Coding System (HCPCS) codes identify the items and services included in claims submitted to payors. HCPCS codes includes both (a) Current Procedural Terminology (CPT®) codes maintained by the American Medical Association, also known as "Level I" HCPCS codes, and (b) "Level II" codes for products, supplies, and services not included in the CPT system. According to CMS:

> HCPCS is a system for identifying items and certain services. It is not a methodology or system for making coverage or payment determinations, and the existence of a code does not, of itself, determine coverage or non-coverage for an item or service. While these codes are used for billing purposes, decisions regarding the addition, deletion, or revision of HCPCS codes are made independent of the process for making determinations regarding coverage and payment.

CMS.GOV, Department of Health & Human Services, *Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures* at 2, available at https://www.cms.gov/medicare/coding/medhcpcsgeninfo/downloads/2018-11-30-hcpcs-level2-coding-procedure.pdf (last visited Jun. 13, 2025). In addition, a product regulated by the FDA -- such as biologicals -- will not be approved for a HCPCS

14

Complaint

code unless the FDA has approved that regulated product for marketing. *Id.* at 7.

48.     Manufacturers of biological products, such as CTPs, apply for HCPCS Level II codes via the Medicare Electronic Application Request Information System. CMS approvals are published quarterly. Generally, HCPCS codes for CTPs are designated per square centimeter ($cm^2$) of product, though the actual supplies may be available in various sizing.

49.     Manufacturers of CTPs do not submit claims directly to payors such as CMS. Instead, medical providers order the products from the manufacturer, and upon completing the skin graft procedure, submit claims to payors. The providers' claims must include the HCPCS codes for the CTPs in order to obtain reimbursement for the expense. Thus, manufacturers typically include product-specific HCPCS codes in the reference materials issued to providers with the products.

50.     Generally, claims for single-use biologicals such as CTPs must include either the JW or the JZ modifier when submitted to CMS. The JW modifier indicates that a portion of the CTP was discarded, while the JZ modifier indicates that there was no discarded amount.

51.     The Medicare Claims Processing Manual provides the following requirements regarding the JW and JZ modifiers:

> When a billing provider or supplier must discard the remainder of a single-dose container or single-use package after administering a dose to a Medicare patient, the program provides payment for the amount of drug or biological discarded as well as the dose administered, up to the amount of the drug or biological as indicated on the vial or package label.
>
> Effective January 1, 2017, when processing claims for drugs and biologicals A/B MACs shall require the use of the JW modifier to identify unused and discarded amounts (hereafter, discarded amounts) of drugs or biologicals from single-dose containers or single-use packages.
>
> . . .
>
> The JW modifier, billed on a separate line, provides payment for the amount of discarded drug or biological. For the administered amount, one claim line shall include the billing and payment code (such as a

15

Complaint

HCPCS code) describing the given drug, no modifier, and the number of units administered in the unit field. For the discarded amount, a second claim line shall include the same billing and payment code as used for the administered amount, the JW modifier, and the number of units discarded in the unit's field.

For example, if a provider or supplier uses a single-dose container that is labeled to contain 100 units of a drug to administer 95 units to the patient and 5 units are discarded. The 95-unit dose is billed on one line, while the discarded 5 units shall be billed on another line with the JW modifier. Both line items would be processed for payment. Providers must record the discarded amounts of drugs and biologicals in the patient's medical record.

Effective July 1, 2023, A/B MACs and DME MACs shall require the use of the JZ modifier to attest that there are no amounts of drugs or biologicals from single-dose containers or single-use packages were unused and discarded for which the JW modifier would be required if there were discarded amounts.

. . .

In general, the JW and JZ modifier policy applies to all drugs separately payable under Medicare Part B that are described as being supplied in a "single-dose" container or "single-use" package based on FDA-approved labeling, including all claims of non-refundable, single-dose container drugs such as multiple source drugs and contrast agents. However, the use of these modifiers is not appropriate for drugs that are from multiple-dose containers. The JW and JZ modifier policy does not apply for drugs that are not separately payable, such as packaged OPPS or ASC drugs, or drugs administered in the FQHC or RHC setting.

52.     CMS determines the price paid for each CTP based on the Average Sales Price ("ASP") of that product for the preceding year. 42 U.S.C. §§ 1395u(o), 1395w-3a; 42 C.F.R. §§ 414.707 (basis of payment for drugs and biologicals under Medicare Part B), 414.804 (basis of payment for submission of manufacturer's average sales price data); *see generally* CMS, *ASP Reporting*, https://www.cms.gov/medicare/payment/part-b-drugs/asp-reporting (last visited Jun. 9, 2025). The ASP methodology is intended to ensure that government payors do not overpay for CTPs. *See generally* 42 U.S.C. § 1395w-3a(d) (directing the Inspector General to compare the ASP to market prices and to disregard the ASP calculation if it surpasses a threshold percentage higher than other pricing methodologies). CMS may impose civil monetary penalties on manufacturers per

Complaint

diem and/or per statement for misrepresentation, failure to file timely information, or false information relating to ASP reporting. *Id.* § 1395w-3a(d)(4).

### C.    TRICARE

53.    In 1995, the Department of Defense established TRICARE, a managed healthcare program, administered by the Defense Health Agency ("DHA"), for individuals and dependents affiliated with the Armed Forces, including members of the Uniformed Services and the spouses and children of active duty, retired, and deceased service members. *See 10 U.S.C. §§ 1071-110b.*  The Government reimburses a portion of the cost of health care services and prescription medications provided to TRICARE beneficiaries.

54.    TRICARE covers only medically necessary inpatient and outpatient care.  TRICARE defines medically necessary care as services or supplies: provided by a hospital, physician, and/or other provider for the prevention, diagnosis, and treatment of an illness, when those services or supplies are determined to be consistent with the condition, illness, or injury; provided in accordance with approved and generally accepted medical or surgical practice, not primarily for the convenience of the patient, the physician, or other providers; and services not exceeding the level of care which is needed to provide safe, adequate, and appropriate diagnosis and treatments. *See 32 CFR § 199.4 (a)(1)(i) and applicable definitions at 32 CFR § 199.9(b).*

55.    As with Medicare, providers submit claims to TRICARE using the CMS 1500 or an electronic equivalent.  Providers therefore make similar certifications in submitting claims to TRICARE as they do when submitting claims to Medicare.

56.    Arrangement by providers with independent contractors, employees, or suppliers to overcharge TRICARE through various means, such as commissions, fee splitting, and kickbacks, in order to divert or conceal improper or unnecessary costs

17

Complaint

or profits is prohibited. *32 CFR § 199.9(c)(12).*

### D.    Other Federal Health Care Programs

57.    Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), administered by the United States Department of Veterans Affairs ("VA"), is a health care program for the families of veterans with 100-percent service-connected disability or who died from a VA-rated service-connected disability.

58.    The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under age 22, administered by the Office of Personal Management ("OPM") pursuant to 5 U.S.C. §§ 8901, *et seq.* Through the OPM, the Government contracts with private health plans to deliver health benefits to its employees.

### E.    Commercial Insurers

59.    Generally, commercial insurers require a substantially similar process to assess coverage for CTPs. As with Medicare, claims for payment for the skin graft procedure must include the product-specific HCPCS code for reimbursement of the CTP.

60.    However, the use of a HCPCS code alone does not guarantee coverage for the CTP. Like Medicare and other government healthcare programs, commercial health insurance plans stipulate that coverage is limited to medically necessary care and claims that comply with all applicable federal and state law. Many commercial insurers deny coverage when a submitted claim involved the violation of federal or state law, particularly any applicable anti-kickback statutes.

61.    Thus, as part of the claim submission process, commercial insurers typically require providers to certify that each claim for payment is for medically necessary care and that the claim is in compliance with applicable federal and state

Complaint

law.

## APPLICABLE LAW

**A.    The Federal and State Anti-Kickback Statutes**

62.    The AKS, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that providing things of value to those who can influence health care decisions may corrupt their professional judgment and result in the payment of federal funds for goods and services that are medically unnecessary, of poor quality, or harmful to patients. *See Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 63 Fed. Reg. 1659, 1662 (Jan. 9, 1998)*.

63.    The AKS is a criminal statute that prohibits any person or entity from soliciting, receiving, offering, or paying any remuneration as an inducement or reward for referring, recommending, ordering, or arranging for the purchase of any item or service for which payment may be made in whole or in part by a federal health care program.  In pertinent part, the statute provides:

> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –
>
> > (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony . . . .
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-
>
> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

19

Complaint

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony . . . .

*42 U.S.C. § 1320a-7b(b)*.

64.    Payors may be liable under Section 1320a-7b(b)(2)(B) "when the defendant: (1) knowingly and willfully makes a payment (2) as inducement to the payee (3) to purchase or recommend for purchase (4) any good or service that is reimbursable under a federal healthcare program." *United States v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1053 (C.D. Cal. 2016), *citing United States v. Miles*, 360 F.3d 472, 479–80 (5th Cir. 2004).

65.    Other purposes for the payment do not absolve liability under AKS when the intent was to induce a referral, purchase, or recommendation for purchase. "[T]he Medicare fraud statute is violated if 'one purpose of the payment was to induce future referrals' . . . 'even if the payments were also intended to compensate for professional services.'" *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989), *quoting United States v. Greber*, 760 F.2d 68, 69 (3d Cir.1985); *see also United States ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 136 (2d Cir. 2024) (collecting cases).

66.    The AKS does not limit liability to instances in which doctors "personally recommend to a patient that he seek care from a particular entity." *United States v. Patel*, 778 F.3d 607, 612, 618 (7th Cir. 2015) (referral instead "requires the doctor to do something that either directs a patient to a particular provider or allows the patient to receive care from that provider.")  Furthermore, "[t]he different subsections do not distinguish between physicians and lay-persons" regarding who is culpable under the AKS; they merely distinguish the forms of culpable conduct. *United States v. Polin*, 194 F.3d 863, 866–67 (7th Cir. 1999); *see also United States v. Gibson*, 875 F.3d 179, 189 (5th Cir. 2017) ("the AKS has no

20

Complaint

'relevant decision maker' or 'medical judgment' requirement [regarding the payee] . . . . The statute criminalizes payments made to 'any person' with the requisite intent.").

67.    Under the AKS, a person "need not have actual knowledge of this section or specific intent to commit a violation," *42 U.S.C. § 1320a-7b(h),* because the "knowingly and willfully" language of the statute includes imputed knowledge and simple volition to participate in the scheme. *See, e.g., United States v. Moshiri,* 858 F.3d 1077, 1082–83 (7th Cir. 2017). "A conspiracy to violate [AKS] requires an agreement to do so, knowing and voluntary participation in the conspiracy, and an overt act by one member of the conspiracy in furtherance of the unlawful goal." *United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017), *citing United States v. Njoku*, 737 F.3d 55, 63–64 (5th Cir. 2013).

68.    Providing commission payments on a per-patient-referral basis is sufficient to incur liability under the AKS, as long as the payment is intended to induce referrals. *See United States v. George*, 900 F.3d 405, 410–12 (7th Cir. 2018).

69.    Several enumerated safe harbors against civil and criminal liability are included in the AKS, and regulatory safe harbors exist. *See 42 U.S.C. § 1320a-7b(b)(3)*; *42 C.F.R. § 1001.952*. However, the Ninth Circuit has held that marketers hired as independent contractors fall outside of the employee safe harbor. *United States v. Ekwebelem*, 669 Fed. App'x 868, 869 (9th Cir. 2016). HHS has also expressly declined to include independent contractors within the regulatory employee safe harbor. *See 42 C.F.R. § 1001.952(i); 54 Fed. Reg. 3088–01 (Jan. 23, 1989)*. The personal services safe harbor does not include commission payments, like those paid by Laboratory Defendants, that are based on the volume or value of referrals. *See 42 C.F.R. § 1001.952(d)(5); see also OIG Advisory Opinion No. 99-3.*

70.    Under the AKS, a claim that includes items or services arising from a

21

Complaint

violation of the statute, like the claims discussed herein, constitutes a false claim under the FCA. *42 U.S.C. § 1320a-7b(g)*; *see also McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1260 (11th Cir. 2005)*. According to the statute's legislative history, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." *155 Cong. Rec. S10854*.

71.    Compliance with the AKS is a condition of payment under the Government health care programs, and participating providers must agree to comply with AKS and certify such compliance. *See generally United States ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F.3d 377 (1st Cir. 2011) (Medicare); State of New York, et al. v. Amgen Inc., 652 F.3d 103 (1st Cir. 2011) (California Medicaid)*. In *United States of America ex rel. Capshaw v. Bryan L. White, M.D., et al.*, 2018 WL 6068806, at *4 (N.D. Tex. Nov. 20, 2018), the court held that "AKS violations are not 'garden variety breaches of contract or regulatory violations' that the Supreme Court sought to shield from the wrath of the FCA. *Escobar*, 136 S. Ct. at 2003. They are serious, consequential, felony transgressions of law that the Government actively enforces. Every indication is that this is precisely the kind of violation the FCA is supposed to reach." *See also United States v. Berkeley Heartlab, Inc.*, 2017 WL 6015574, at *2 (D.S.C. Dec. 4, 2017) (holding "AKS compliance is material to payment decisions in all cases.").

72.    The States also have relevant anti-kickback laws similar to the AKS, which apply to medical providers and entities participating in the States' respective Medicaid programs. *See Cal. Bus. and Prof. Code § 650 and Cal. Welf. & Inst. Code § 14107.2 (California)*; *Colo. Rev. Stat. §24-31-809 (Colorado)*; *Del. Code Ann. tit. 31, § 1005 (Delaware)*; *Fla. Stat. §§ 456.054 & 817.505 (Florida)*; *305 Ill. Comp. Stat. 5/8A-3 and 336 Ill. Comp. Stat. 60/22.2 (Illinois)*; *Mich. Comp. Laws §§*

22

Complaint

*400.604 & 752.1004 (Michigan)*; *Minn. Stat. § 609.542 (Minnesota)*; *Mont. Code Ann. § 45-6-313 (Montana)*; *N.M. Stat. Ann. §§ 30-41-1 & 30-44-7 (New Mexico)*; *N.Y. Soc. Serv. Law § 366-D (New York)*; *Tex. Occ. Code Ann. § 102.001 (Texas)*.

73.     Commercial insurance companies in California and Illinois also require compliance with federal and state laws, including the California AKS, *Cal. Welf. & Inst. Code § 14107.2* (criminalizing kickbacks in healthcare generally), and the Illinois Medical Practice Act, *336 Ill. Comp. Stat. 60/22.2* (prohibition on fee-splitting).

**B.     Eliminating Kickbacks in Recovery Act Of 2018**

74.     The Eliminating Kickbacks in Recovery Act of 2018 ("EKRA"), 18 U.S.C. § 220, imposes criminal liability on any individual or entity who knowingly and willfully:

> (1) solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring a patient or patronage to a recovery home, clinical treatment facility, or laboratory; or
>
> (2) pays or offers any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> > (A) to induce a referral of an individual to a recovery home, clinical treatment facility, or laboratory; or
> >
> > (B) in exchange for an individual using the services of that recovery home, clinical treatment facility, or laboratory . . . .

*18 U.S.C. § 220(a)*. EKRA does "not apply to conduct that is prohibited under section 1128B of the Social Security Act (42 U.S.C. 1320a-7b) [AKS]." *18 U.S.C. § 220(d)(1)*. If a court were to somehow conclude that the AKS does not apply to the conduct alleged herein, EKRA would apply. *18 U.S.C. § 220(c)*.

75.     EKRA provides for some safe harbors, including:

> a payment made by an employer to an employee or independent contractor (who has a bona fide employment or contractual relationship with such employer) for employment, if the employee's [or independent contractor's] payment is not determined by or does not vary by—

23

Complaint

(A) the number of individuals referred to a particular recovery home, clinical treatment facility, or laboratory;

(B) the number of tests or procedures performed; or

(C) the amount billed to or received from, in part or in whole, the health care benefit program from the individuals referred to a particular recovery home, clinical treatment facility, or laboratory;

*18 U.S.C. § 220(b)(2)*. Thus, by EKRA's statutory terms, commission payments to employees or independent contractors that are based on the value or volume of referrals, or billed and received amounts, do not satisfy the safe harbor and therefore violate EKRA.

**C.      The Federal and State False Claims Acts**

76.      The False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21 ("FERA") enacted May 20, 2009, provides, in relevant part:

Liability for Certain Acts.  (1) In General – Subject to paragraph (2), any person who –

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), … or (G) …

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than [currently $14,308] and not more than [currently $28,619] [for conduct occurring during the time period alleged in this Complaint] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

*31 U.S.C. § 3729(a)(1)*.  The FCA further provides:

Actions by Private Persons.  (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States

24

Complaint

Government.    The action shall be brought in the name of the Government.

*31 U.S.C. § 3730(b)(1).*

77.    In addition, each of the States have False Claims Acts that impose substantially similar requirements, penalties, and damages for false claims made to their respective State governments.  *See California False Claims Act, Cal. Gov't Code §§ 12650, et seq.*; *Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, et seq.*; *Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201, et seq.*; *Florida False Claims Act, Fla. Stat. §§ 68.081, et seq.*; *Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1, et seq.*; *Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601, et seq.*; *Minnesota False Claims Act, Minn. Stat. §§ 15C.01, et seq.*; *Montana False Claims Act, Mont. Code Ann. §§ 17-8-403, et seq.*; *New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1, et seq.*; *New York False Claims Act, N.Y. State Fin. Law §§ 187, et seq.*; *Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101, et seq.*;  *Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001, et seq.* (unless otherwise indicated, collectively referred to as the "States' False Claims Acts").

### D.    The California Insurance Frauds Prevention Act

78.    To combat rampant insurance fraud, the California Legislature enacted the California IFPA, Cal. Ins. Code §§ 1871, *et seq.* The Legislature recognized the "potential for abuse and illegal activities" and designed the IFPA "to permit the full utilization of the expertise of the commissioner and the department so that they may more effectively investigate and discover insurance frauds, [and] halt fraudulent activities." *Cal. Ins. Code § 1871(a)*. The Legislature also highlighted the negative impact of health insurance fraud in particular, advising that "it is believed that fraudulent activities account for billions of dollars annually in added health care costs nationally. Health care fraud causes losses in premium dollars and increases health care costs unnecessarily." *Id. § 1871(h)*. Unlike the False Claims Acts, the

Complaint

IFPA encompasses false claims made to private health insurance companies.

79.     The IFPA permits civil enforcement of relevant provisions of the California Penal Code, either by the State of California or by any "interested person" on the state's behalf, i.e., a relator in a qui tam action. Specifically, the IFPA provides that any person who violates a provision of California Penal Code sections 549 or 550 is liable for civil penalties between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim. *Cal. Ins. Code § 1871.7(b)*.

80.     The California Penal Code provides, in relevant part, the following regarding insurance fraud:

(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

…

(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

…

(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

…

26

Complaint

(h) This section shall not be construed to preclude the applicability of any other provision of criminal law or equitable remedy that applies or may apply to any act committed or alleged to have been committed by a person.

*Cal. Pen. Code § 550.*

81. The California Penal Code provides, in relevant part, the following regarding illegal solicitations and referrals:

Any firm, corporation, partnership, or association, or any person acting in his or her individual capacity, or in his or her capacity as a public or private employee, who solicits, accepts, or refers any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether, the individual or entity for or from whom the solicitation or referral is made, or the individual or entity who is solicited or referred, intends to violate Section 550 of this code or Section 1871.4 of the Insurance Code is guilty of a crime…

*Cal. Pen. Code § 549.* In other words, knowingly participating in a scheme with an individual or entity that intends to commit insurance fraud is also a crime.

82. The IFPA allows any person having knowledge of such illegal conduct to bring an action and to share in any recovery. The IFPA's filing and disclosure requirements mirror those of the False Claims Acts. *Cal. Ins. Code § 1871.7(e)(1).*

**E.    The Illinois Insurance Claims Fraud Prevention Act**

83. Like California, Illinois passed the ICFPA, 740 Ill. Comp. Stat. 92/1, et seq., to combat rampant insurance fraud. Specifically, the ICFPA provides that any person who violates provisions of the Illinois Criminal Code sections 17-8.5 (fraud on the government) or 17-10.5 (fraud on private companies) is liable for civil penalties between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim. 740 Ill. Comp. Stat. 92/15(b).

84. In relevant part, the Illinois Criminal Code provides the following regarding fraud on the government:

A person commits fraud on a governmental entity when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of any governmental entity by the

27

Complaint

making of a false claim of bodily injury or of damage to or loss or theft of property or by causing a false claim of bodily injury or of damage to or loss or theft of property to be made against the governmental entity, intending to deprive the governmental entity permanently of the use and benefit of that property.

720 Ill. Comp. Stat. 5/17-8.5(a). "Property" means "anything of value," including money. *Id.* §§ 5/17-8.5(i) & 5/15-1. The criminal code also includes conspiracy to commit insurance fraud and organization of such a conspiracy. *Id.* §§ 5/17-8.5(c) & (d).

85.    In relevant part, the Illinois Criminal Code provides the following regarding fraud on private insurance companies:

A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.

*Id.* § 5/17-10.5(a). "Property" means "anything of value," including money. *Id.* §§ 5/17-10.5(h) & 5/15-1. The criminal code also includes conspiracy to commit insurance fraud and organization of such a conspiracy. *Id.* § 5/17-10.5(c).

86.    The ICFPA also provides, in relevant part, the following regarding illegal solicitations and referrals:

Except as otherwise permitted or authorized by law, it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer.

740 Ill. Comp. Stat. 92/5(a).

87.    The Illinois ICFPA allows any "interested person" having knowledge of such illegal conduct to bring an action and to share in any recovery, *i.e.*, a relator in a qui tam action.  *Id.* § 92/15. The ICFPA's filing and disclosure requirements mirror those of the False Claims Acts.  *Id.* §§ 92/15 & 92/30.

Complaint

## THE FRAUD SCHEMES

88.    Each of the Defendants' fraud schemes has a similar framework: the Laboratories, either directly or through distributors, knowingly pay commissions to Third-Party Marketers, who receive and retain such commissions for referral of patients to medical providers for CTPs. A written agreement expressly provides that the commissions will vary with the value and/or volume of CTPs billed and/or paid for by the medical providers. The providers then submit claims for their services and the expensive costs of the products to Government health care programs and commercial insurers -- despite everyone involved knowing that these payments violate EKRA and/or the AKS. If the Government and commercial insurers had known that the Laboratories paid commissions to distributors or TPMs, or that TPMs had further paid commissions to other independent contractors to induce referrals, they would have denied coverage for the CTPs.

89.    CTPs are billed to payors per square centimeter ($cm^2$), but the products are available in numerous dimensions to accommodate varying size wounds. Each of the CTPs discussed *infra* are covered by Government health care programs and commercial insurers, provided that they are billed together with a skin graft procedure and meet all coverage requirements.

### I.    LABORATORIES

90.    Each of the Laboratory Defendants and Doe Defendants has knowingly and willfully paid illegal commission-based payments to one or more TPM Defendants and Doe Defendants to refer patients for CTPs. Through their conduct, each of the Defendants has conspired with other Defendants and has directly caused the submissions of false claims resulting from the illegal payments. Each of the Defendants has also conspired with other Defendants and caused submission of material false claims through false certification of compliance with the AKS statute and other Medicare and Medicaid laws, regulations, and program instructions. In

Complaint

conspiring with each other and causing the submission of such false claims, each of the Defendants has also knowingly retained payments to which they are not entitled.

91.     In general, the process to manufacture each CTP is patented before the product is available on the market. Patent holders then either manufacture the product themselves or license the manufacturing process intellectual property to laboratories. The manufacturer or patent holder must also obtain FDA approval to market each CTP, as well as a HCPCS code from CMS so that providers who purchase the CTP can bill it to payors. *See generally* 21 C.F.R. § 601.1, *et seq.* (FDA biologics licensing provisions).

92.     Each of the Defendants either acquired a HCPCS code for their CTP(s) or include the HCPCS code in their CTP reference materials with the understanding that providers will use those HCPCS codes to submit claims to payors.

**A.     Amnio Technology LLC**

93.     Amnio Technology LLC ("Amnio") is responsible for manufacturing PalinGen Membrane, a CTP. PalinGen Membrane is billable to payors under HCPCS code Q4173.

94.      Amnio contracts with Progress Medical to market PalinGen Membrane to medical providers. The remuneration to Progress Medical is a percentage of the sales price of PalinGen Membrane products.

95.     Progress Medical sought to contract with Relators to help market Amino's  CTPs. Attached as Exhibit A is the Non-Exclusive Sales Agent and Personal Services Agreement ("Updated Sales Agreement") offered by Progress Medical to Relators. As Amino is aware, at section 2.2, the agreement specifies that the relationship between Progress Medical and Relators would be:

> that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the parties as partners, co-owners or otherwise as participants in a joint undertaking, or (iii) allow Agent to create or assume any obligation on behalf of [Progress Medical LLC] for any purpose whatsoever.

30

Complaint

96. The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for PalinGen Membrane is 15%.

97. Amnio actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hires and pays commissions to TPMs as independent contractors to market PalinGen Membrane.

98. Amnio actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical pays TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of PalinGen Membrane sales.

99. Amnio does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of Amnio's illegal conduct, they would have denied its claims for payment.

**B.    BioLab Sciences, Inc., BioLab Holdings, Inc., and BLS Labs, LLC**

100. BioLab Sciences, Inc. is the patent owner and licensor of the process to manufacture Membrane Wrap and Membrane Wrap-Hydro, which are CTPs. Membrane Wrap is billable to payors under HCPCS code Q4205, and Membrane Wrap-Hydro is billable under Q4290.

101. BioLab Holdings, Inc. is the parent company of both BLS Labs, LLC (the licensed manufacturer of Membrane Wrap and Membrane Wrap-Hydro) and BLS Sales and Marketing, LLC (the primary marketing company for these products).

102. BioLab Sciences, Inc., BioLab Holdings, Inc., and BLS Labs, LLC hire

31

Complaint

TPMs on a commission basis to maximize revenue for their products. They contract with BLS Sales and Marketing, LLC and Progress Medical to market Membrane Wrap and Membrane Wrap-Hydro to medical providers. The remuneration to BLS Sales and Marketing, LLC and Progress Medical is a percentage of the sales price of the Membrane Wrap and Membrane Wrap-Hydro CTPs.

103. Progress Medical sought to contract with Relators to help market the products, using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

104. The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for Membrane Wrap and Membrane Wrap-Hydro is 15%.

105. BioLab Sciences, Inc., BioLab Holdings, Inc., and BLS Labs, LLC actually know, recklessly disregard, or are deliberately ignorant  that Progress Medical hires and continues to hire TPMs as independent contractors to market Membrane Wrap and Membrane Wrap-Hydro.

106. BioLab Sciences, Inc., BioLab Holdings, Inc., and BLS Labs, LLC actually know, recklessly disregard, or are deliberately ignorant that Progress Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of Membrane Wrap and Membrane Wrap-Hydro sales.

107. BioLab Sciences, Inc., BioLab Holdings, Inc., and BLS Labs, LLC do not exercise sufficient control over the conduct of their TPMs' independent contractor sales representatives. Instead, they have illegally paid, and continue to illegally pay, commissions to TPMs' sales representatives to sell their CTP products. By doing so, they have caused and continue to cause providers to submit false claims

32

Complaint

for those products to Government health care programs and commercial insurers. If those payors had been aware of BioLab Sciences, Inc.'s, BioLab Holdings, Inc.'s, and BLS Labs, LLC's illegal conduct, they would have denied their claims for payment.

**C.    BioStem Technologies, Inc. and Direct Biologics, Inc.**

108.    Direct Biologics, Inc. is the patent owner and licensor of AmnioWrap Two, a CTP. AmnioWrap Two is billable to payors under HCPCS code Q4221.

109.    BioStem Technologies, Inc. is the licensed manufacturer of AmnioWrap Two.

110.    BioStem Technologies, Inc. is also responsible for manufacturing Vendaje AC, another CTP. Vendaje AC is billable to payors under HCPCS code Q4279.

111.    BioStem Technologies, Inc. and Direct Biologics, Inc. hire third party marketers on a commission basis to maximize revenue for their products. They contract with Progress Medical and Venture Medical to market AmnioWrap Two to medical providers. The remuneration to Progress Medical and Venture Medical is a percentage of the sales price of AmnioWrap Two Membrane products.

112.    BioStem Technologies, Inc. also contracts with Progress Medical and Venture Medical to market Vendaje AC to medical providers. The remuneration to Progress Medical and Venture Medical is a percentage of the sales price of Vendaje AC products.

113.    As noted above, Exhibit A section 2.2 specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

114.    The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for AmnioWrap Two

33

Complaint

and Vendaje AC is 10%.

115. BioStem Technologies, Inc. and Direct Biologics, Inc. actually know, recklessly disregard, or are deliberately ignorant that Progress Medical and Venture Medical hires and pays commissions to TPMs as independent contractors to market AmnioWrap Two and/or Vendaje AC.

116. BioStem Technologies, Inc. and Direct Biologics, Inc. actually know, recklessly disregard, or are deliberately ignorant that Progress Medical and Venture Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of AmnioWrap Two and/or Vendaje AC sales.

117. BioStem Technologies, Inc. and Direct Biologics, Inc. do not exercise sufficient control over the conduct of their TPMs' independent contractor sales representatives. Instead, they have illegally paid, and continue to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, they have caused and continue to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of BioStem Technologies, Inc.'s and Direct Biologics, Inc.'s illegal conduct, they would have denied their claims for payment.

### D.    HealthTech Wound Care, Inc.

118. HealthTech Wound Care, Inc. ("HealthTech") is responsible for manufacturing DermaBind FM and DermaBind TL, which are CTPs. DermaBind FM is billable to payors under HCPCS code Q4313, and DermaBind TL is billable under Q4225.

119. HealthTech contracts with World Reach Health, LLC, which is the exclusive distributor of DermaBind FM and DermaBind TL. In turn, World Reach Health, LLC contracts with other TPMs, including Progress Medical, to market DermaBind FM and DermaBind TL to medical providers. The remuneration to

34

Complaint

World Reach Health, LLC and to Progress Medical is a percentage of the sales price of DermaBind FM and DermaBind TL products.

120. Progress Medical sought to contract with Relators to help market HealthTech's CTPs using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

121. The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for DermaBind FM and DermaBind TL is 15%.

122. HealthTech actually knows, recklessly disregards, or is deliberately ignorant that TPMs, including Progress Medical, hires and pays commissions to TPMs as independent contractors to market DermaBind FM and DermaBind TL.

123. HealthTech actually knows, recklessly disregards, or is deliberately ignorant that TPMs, including Progress Medical, paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of DermaBind FM and DermaBind TL sales.

124. HealthTech does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of HealthTech's illegal conduct, they would have denied its claims for payment.

E. **Legacy Medical Consultants, LP**

125. Legacy Medical Consultants, LP ("Legacy") is a licensed manufacturer for numerous CTPs, including InnovaMatrix AC (HCPCS code A2001), PalinGen

35

Complaint

Membrane (Q4173), Impax (Q4262), ORION Amniotic Membrane (Q4276), SurGraft FT (Q4268), and Zenith Membrane (Q4253).

126. Legacy subcontracts with TPMs, including Progress Medical, as independent contractors to market those CTPs in exchange for commissions based on the value or volume of referrals for CTPs.

127. Legacy actually knows, recklessly disregards, or is deliberately ignorant that TPMs, including Progress Medical, hire and pay commissions to TPMs as independent contractors to market InnovaMatrix AC, CompleteACA, PalinGen Membrane, Impax, ORION Amniotic Membrane, SurGraft FT, and Zenith Membrane.

128. Legacy actually knows, recklessly disregards, or is deliberately ignorant that TPMs, including Progress Medical, paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of InnovaMatrix AC, PalinGen Membrane, Impax, ORION Amniotic Membrane, SurGraft FT, and Zenith Membrane sales.

129. Legacy does not exercise sufficient control over the conduct of its independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of Legacy's illegal conduct, they would have denied its claims for payment.

F.    **MLM Biologics, Inc.**

130. MLM Biologics, Inc. ("MLM") is responsible for manufacturing bio-ConneKt, a CTP. Bio-ConneKt is billable to payors under HCPCS code Q4161.

131. MLM contracts with Progress Medical to market bio-ConneKt to medical providers. The remuneration to Progress Medical is a percentage of the sales

36

Complaint

price of bio-ConneKt products.

132. Progress Medical sought to contract with Relators to help market the products, using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

133. The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for bio-ConneKt is 10%.

134. MLM actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hires and pays TPMs as independent contractors to market bio-ConneKt.

135. MLM actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of bio-ConneKt sales.

136. MLM does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of MLM Biologics, Inc.'s illegal conduct, they would have denied its claims for payment.

**G.    Pinnacle Transplant Technologies, LLC**

137. Pinnacle Transplant Technologies, LLC ("Pinnacle") is responsible for manufacturing Cocoon Membrane, a CTP. Cocoon Membrane is billable to payors under HCPCS code Q4264.

138. Pinnacle contracted with Progress Medical to market Cocoon

Complaint

Membrane to medical providers. The remuneration to Progress Medical is a percentage of the sales price of Cocoon Membrane products.

139. Progress Medical sought to contract with Relators to help market Cocoon Membrane, Pinnacle's CTP. Attached as Exhibit B is the original Non-Exclusive Sales Agent and Personal Services Agreement offered by Progress Medical to Relators ("Original Sales Agreement"). At section 2.2, the agreement specifies that the relationship between Progress Medical and Relators would be:

> that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the parties as partners, co-owners or otherwise as participants in a joint undertaking, or (iii) allow Agent to create or assume any obligation on behalf of [Progress Medical LLC] for any purpose whatsoever.

140. The final page of Exhibit B lists the commission rates for "Progress Medical Referral Program[:] 10% referral fee for all products sold to accounts introduced by MedXPrime[.] The referral fee is calculated from collected net dollars." Cocoon Membrane is one of the listed products.

141. Pinnacle actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hired and paid commissions to TPMs as independent contractors to market Cocoon Membrane.

142. Pinnacle actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical paid TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of Cocoon Membrane sales.

143. Pinnacle does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of Pinnacle's illegal conduct,

38

Complaint

they would have denied its claims for payment.

### H.    Precise Bioscience Corporation

144.    Precise Bioscience Corporation ("Precise") is responsible for manufacturing XCell Amnio Matrix, a CTP. XCell Amnio Matrix is billable to payors under HCPCS code Q4280.

145.    Precise contracts with Progress Medical to market XCell Amnio Matrix to medical providers. The remuneration to Progress Medical is a percentage of the sales price of XCell Amnio Matrix products.

146.    Progress Medical sought to contract with Relators to help market the products using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

147.    The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for XCell Amnio Matrix is 15%.

148.    Precise actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hires and pays commissions to TPMs as independent contractors to market XCell Amnio Matrix.

149.    Precise actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of XCell Amnio Matrix sales.

150.    Precise does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to

39

Complaint

submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of Precise's illegal conduct, they would have denied its claims for payment.

**I.      RedDress USA, Inc.**

151.   RedDress USA, Inc. ("RedDress") is responsible for manufacturing ActiGraft, an autologous blood derived product for chronic, non-healing wounds. ActiGraft is billable to payors under HCPCS code G0460 or G0465.

152.   RedDress contracts with Progress Medical to market ActiGraft to medical providers. The remuneration to Progress Medical is a percentage of the sales price of ActiGraft products.

153.   Progress Medical sought to contract with Relators to help market the products, using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

154.   The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for ActiGraft is 10%.

155.   RedDress actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hires and pays commissions to TPMs as independent contractors to market ActiGraft.

156.   RedDress actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of ActiGraft sales.

157.   RedDress does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell

Complaint

its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of RedDress's illegal conduct, they would have denied its claims for payment.

**J.    Royal Biologics, Inc.**

158.    Royal Biologics, Inc. ("Royal") is responsible for manufacturing Amnio-Maxx, a CTP. Amnio-Maxx is billable to payors under HCPCS code Q4239.

159.    Royal contracts with Progress Medical to market Amnio-Maxx to medical providers. The remuneration to Progress Medical is a percentage of the sales price of Amnio-Maxx products.

160.    Progress Medical sought to contract with Relators to help market the products, using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

161.    The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for Amnio-Maxx is 15%.

162.    Royal actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hires and pays commissions to TPMs as independent contractors to market Amnio-Maxx.

163.    Royal actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of Amnio-Maxx sales.

164.    Royal does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and

Complaint

continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of Royal's illegal conduct, they would have denied its claims for payment.

**K.    Samaritan Biologics LLC**

165.    Samaritan Biologics LLC ("Samaritan") is responsible for manufacturing Complete AA, Complete SL, and MOST which are CTPs. Complete AA is billable to payors under HCPCS code Q4303, Complete SL is billable under Q4270, and MOST is billable under Q4328.

166.    Samaritan contracts with Progress Medical to market Complete AA, Complete SL, and MOST to medical providers. The remuneration to Progress Medical is a percentage of the sales price of Complete AA, Complete SL, and MOST products.

167.    Progress Medical sought to contract with Relators to help market the products, using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

168.    The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for Complete AA, Complete SL, and MOST is 10%.

169.    On June 18, 2025, Mr. Pollak sent an e-mail to Relator Prins stating that Samaritan was one of two manufacturers "threatening [to] tak[e a provider] to collections, due to non-payment and not providing supporting documentation substantiating reason for non-payment. That includes original claims, denial remits, appeals or resubmission of claims with entire timeline of documentation for each

Complaint

unpaid invoice." Samaritan knows and relies upon providers to submit claims for payment to government and commercial payors for these CTPs. If there was no knowledge of or reliance on this practice, Samaritan would not have waited to collect on invoices that were considered past due under their sales agreements.

170. Samaritan actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hires and pays commissions to TPMs as independent contractors to market Complete AA, Complete SL, and MOST.

171. Samaritan actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of Complete AA, Complete SL, and MOST sales.

172. Samaritan does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of Samaritan's illegal conduct, they would have denied its claims for payment.

**L.    Stratus Biosystems, LLC d/b/a CellGenuity Regenerative Science**

173. Stratus Biosystems, LLC d/b/a CellGenuity Regenerative Science ("Stratus") is responsible for manufacturing AmnioAMP-MP, a CTP. AmnioAMP-MP is billable to payors under HCPCS code Q4250.

174. Stratus contracts with Progress Medical to market AmnioAMP-MP to medical providers. The remuneration to Progress Medical is a percentage of the sales price of AmnioAMP-MP products.

175. Progress Medical sought to contract with Relators to help market the products, using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that

43

Complaint

the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

176. The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for AmnioAMP-MP is 15%.

177. Stratus actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hires and pays commissions to TPMs as independent contractors to market AmnioAMP-MP.

178. Stratus actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of AmnioAMP-MP sales.

179. Stratus does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of Stratus's illegal conduct, they would have denied its claims for payment.

**M.      Surgenex, LLC**

180. Surgenex, LLC ("Surgenex") is the patent owner and licensor for numerous CTPs, including SurGraft FT. SurGraft FT is billable to payors under HCPCS code Q4268.

181. Surgenex contracts with manufacturers and TPMs, including Legacy Medical Consultants, LP and Progress Medical LLC, as independent contractors to market those CTPs in exchange for commissions based on the value or volume of

44

Complaint

referrals for CTPs.

182. Surgenex actually knows, recklessly disregards, or is deliberately ignorant that manufacturers and TPMs, including Legacy Medical Consultants, LP and Progress Medical, hire and pay commissions to TPMs as independent contractors to market SurGraft FT.

183. Surgenex actually knows, recklessly disregards, or is deliberately ignorant that manufacturers and TPMs, including Legacy Medical Consultants, LP and Progress Medical, paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of SurGraft FT sales.

184. Surgenex does not exercise sufficient control over the conduct of its independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for those CTPs to Government health care programs and commercial insurers. If those payors had been aware of Surgenex's illegal conduct, they would have denied its claims for payment.

### N.   Xtant Medical Holdings, Inc.

185. Xtant Medical Holdings, Inc. ("Xtant") is responsible for manufacturing SimpliMax, a CTP. SimpliMax is billable to payors under HCPCS code Q4341.

186. Xtant contracts with Progress Medical to market SimpliMax to medical providers. The remuneration to Progress Medical is a percentage of the sales price of SimpliMax products.

187. Progress Medical sought to contract with Relators to help market the products, using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of

Complaint

independent contractors" and not an employer-employee relationship.

188. The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for SimpliMax is 15%.

189. Xtant actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hires and pays commissions to TPMs as independent contractors to market SimpliMax.

190. Xtant actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of SimpliMax sales.

191. Xtant does not exercise sufficient control over the conduct of its TPMs' independent contractor sales representatives. Instead, it has illegally paid, and continues to illegally pay, commissions to TPMs' sales representatives to sell its CTP product. By doing so, it has caused and continues to cause providers to submit false claims for CTPs to Government health care programs and commercial insurers. If those payors had been aware of Xtant's illegal conduct, they would have denied its claims for payment.

## II.    THIRD-PARTY MARKETERS

192. Each of the Third-Party Marketer Defendants is an independent contractor that has knowingly and willfully received and retained illegal commission-based payments, knowingly caused the submission of false claims, and knowingly conspired with other defendants to submit false claims and retain payments to which they are not entitled.

### A.    Progress Medical LLC

193. Progress Medical is a third-party marketer that has contracted with each of the Laboratory Defendants named herein to market their products to providers.

46

Complaint

194.   Progress Medical has also contracted with World Reach Health, LLC, the exclusive distributor for HealthTech Wound Care, Inc., to market DermaBind FM and DermaBind TL.

195.   Relators work in the medical billing industry for numerous medical providers. As part of their work, they also appeal payor denials on behalf of providers. The appeal process includes verifying that the providers meet all billing requirements for the services and supplies billed.

196.   During the course of her work on appeals, Relator Prins occasionally spoke with Holly Mata, who appeared to be an employee of Progress Medical. In some instances, Ms. Mata e-mailed reimbursement guides from a Progress Medical e-mail address with information related to appeals. Ms. Mata's e-mail signature did not specify her position at the company.

197.   In conversations in early 2025, Relator Prins learned that Ms. Mata is an independent contractor rather than an employee of Progress Medical. Further, Ms. Mata claimed that she earned commissions based on her sales of skin graft substitutes, and that she worked for several similar companies as well.

198.   Ms. Mata then put Relators in contact with Jim Pollak, the CEO of Progress Medical. During a call on February 17, 2025, Mr. Pollak expressed interest in a partnership: in exchange for disseminating initial marketing materials to Relators' clients (medical providers), Relators would receive a percentage commission for all CTP sales to those providers. Relators would not be expected to market the CTPs themselves, but simply to provide referrals. Relators have refused to participate in the illegal conduct. They have never provided names of medical providers nor disseminated the marketing materials.

199.   Attached as Exhibit B is the first "Non-Exclusive Sales Agent and Personal Services Agreement" (the "Original Sales Agreement") that Mr. Pollak sent to Relators on February 18, 2025.

Complaint

200. The Original Sales Agreement provides that "The relationship of [Progress Medical] and Agent established by this Agreement is that of independent contractors…" *Id.* at § 2.2. It further states that "Agent shall use his or her best efforts to legally promote and sell the Products, and shall, at his or her sole cost, expense, and risk: (i) maintain suitable organization for and use his or her best efforts to actively promote and sell [Progress Medical's] Products. Exhibit A lists the Products and the MSRP for each product." *Id.* at § 3.1

201. As to compensation, the Original Sales Agreement states, "Agent's sole compensation under the terms of this Agreement shall be a commission computed in accordance with the methodology set forth in Exhibit A attached to this Agreement. The commission shall apply to all orders solicited by the Agent that have been accepted by the Company and for which a valid purchase order has been received. Commissions shall be computed on the net amount billed by the Company to the customer, and no commission shall be paid with respect to charges for handling, freight, sales taxes, C.O.D. charges, insurance, import duties, trade discounts, repairs, and other similar charges and expenses." *Id.* at § 4.1.

202. Exhibit A to the Original Sales Agreement provides the following regarding compensation: "**Progress Medical Referral Program**[:] 10% referral fee for all products sold to accounts introduced by [Agent.] The referral fee is calculated from collected net dollars." *Id.* at Exhibit A (emphasis in original). The listed CTPs are ActiGraft, AmnioAMP-MP, bioConneKt, Cocoon Membrane, Complete ACA, DermaBind FM, DermaBind TL, Membrane Wrap, Membrane Wrap Hydro, Samaritan Skin Substitutes (Complete AA), SimpliMax, and XCell Amnio Matrix.

203. On June 9, 2025, Mr. Pollak e-mailed an Updated Sales Agreement to Relators, attached as Exhibit A. Exhibit A contained an updated product listing for Quarter 2 2025 which no longer included Cocoon Membrane. The listing also added several products: Amnio-Maxx, AmnioWrap Two, Complete SL, MOST, PalinGen

48

Complaint

Membrane, and Vendaje AC. The offered commission changed from 10% on all products to a set percentage for each type of product. However, the other terms quoted above were unchanged.

204. Mr. Pollak stated to Relators that Progress Medical updated its list of offered products each quarter. This schedule is consistent with CMS' quarterly schedule of HCPCS code assignments for CTPs.

205. Attached as Exhibit C is the Progress Medical Wound Care Portfolio for 2025 Quarter 2 that Mr. Pollak sent to Relators on April 15, 2025. This document lists 15 CTPs with their HCPCS codes and "Invoice Price." Exhibit C also states "Net 45" or "Net 30," which conveys to the providers whether the invoice should be paid by providers to the manufacturers within 45 or 30 days.

206. On June 18, 2025, Mr. Pollak sent an e-mail to Relator Prins stating that two manufacturers "are threatening taking [a provider] to collections, due to non-payment and not providing supporting documentation substantiating reason for non-payment. That includes original claims, denial remits, appeals or resubmission of claims with entire timeline of documentation for each unpaid invoice." Progress Medical knows and relies upon providers to submit claims for payment to government and commercial payors for these CTPs. If there was no knowledge of or reliance on this practice, Progress Medical would not have waited to collect on invoices that were considered past due under their sales agreements.

207. Attached as Exhibit D is another version of the Q2 2025 portfolio that Mr. Pollak sent to Relators on May 26, 2025. This document lists an "Invoice Price" and a "Discount Price" for each of Progress Medical's offered CTPs. The final column calculates the commission Relators could earn per unit sold based on the Discount Price.

208. Relators questioned Mr. Pollak regarding the pricing in Exhibit D. He responded by e-mail on June 7, 2025 and stated, "All products on our purchase

49

Complaint

agreement are invoiced at 60% of the allowable.  From our other manufacturers, we offer a 40% discount [to providers] which is the same just worded differently in their agreements. […] The discount is effective for every order, other than one manufacturer has the discount based on ordering 3 grafts per month."

209.   Attached as Exhibit E is the Progress Medical Registration form that Mr. Pollak sent to Relators on May 26, 2025. This document is intended to be completed by the independent sales representative and the medical provider that intends to purchase CTPs through Progress Medical.

210.   Exhibit E states:

**2. Insurance Verification.** Customer agrees to utilize Progress Medicals' Insurance Verification Request (IVR) Process. Customer will be provided with the IVR form which will be submitted to our reimbursement team and receive the authorization prior to ordering and using Products.

**3. Reimbursement Team.** Customer will utilize Progress Medical's Reimbursement team to assist with any unpaid or denied claims. Progress Medical will require a copy of the original claim and denial remit to assist in the appeal process.

**4. Order Fulfillment.** After Customer submits an IVR and receives confirmation of patient's benefits, the Customer places an order and Progress Medical accepts the order and generates an Invoice, which will reflect that the Customer has agreed to purchase the Products identified on the Invoice and the terms of the purchase. Progress Medical shall, on the Customer's behalf, promptly pack and ship the Products identified on the Invoice for delivery to the Customer. Progress Medical shall provide delivery status information from the carrier to the Customer for shipment.

In summary, Progress Medical assists providers with obtaining payor approval for the CTP products before they place an order. In the event of a claim denial, Progress Medical also assists payors with the appeal process.

211.   Schedule A to Exhibit E provides the following table:

50

Complaint

| Check Below Products to Register | Product | Invoice Price per sq. cm. |
|---|---|---|
| | Q4313 DermaBind FM CMS ASP | $2,002.34 |
| | Q4280 XCell Amnio Matrix CMS ASP | $1,947.63 |
| | Q4250 AmnioAmp-MP CMS ASP | $1,717.88 |
| | Q4239 Amnio-Maxx CMS ASP | $1,409.95 |
| | Q4290 Membrane Wrap Hydro CMS ASP | $1,104.60 |
| | Q4225 DermaBind TL CMS ASP | $832.25 |
| | Q4205 Membrane Wrap CMS ASP | $633.58 |
| | Q4173 PalinGen Membrane CMS ASP | $216.30 |
| | Q4341 SimpliMax Fee Schedule-First Coast, Novitas | $2,178.60 |

212. The prices above are each less than the prices listed in Exhibit D (Progress Medical Wound Care Portfolio). However, the prices above match the "Discount Price" listed in Exhibit C (Q2 2025 Portfolio). Thus, these are the prices that providers would pay to Progress Medical per unit of that product, while the providers were expected to bill the ASP to payors.

213. Progress Medical has built its business model on the illegal practice of receiving compensation from manufacturers as a percentage of CTPs sold, which is dependent on both the value and volume of the referrals for CTPs. Progress Medical has further hired other TPMs to market the CTPs on its behalf, offering a smaller percentage of its own rate as inducement for referrals.

214. Progress Medical does not exercise sufficient control over the conduct of its independent contractor sales representatives. Instead, it has illegally received, and continues to illegally receive, commissions to sell CTPs, and it has illegally paid, and continues to illegally pay, commissions to sell CTPs. By doing so, it has caused and continues to cause the submission of false claims for those products to Government health care programs and commercial insurers. If those payors had been

Complaint

aware of Progress Medical's illegal conduct, they would have denied the claims for payment.

### B. BLS Sales and Marketing, LLC

215. BLS Sales and Marketing, LLC ("BLS") is the primary third-party marketer that has contracted with BioLab Sciences, Inc., BioLab Holdings, Inc., and BLS Labs, LLC to market Membrane Wrap, Membrane Wrap-Hydro, and other CTPs to providers. BLS subcontracts with other TPMS to supplement its marketing, including Defendants Progress Medical and Venture Medical LLC.

216. Progress Medical sought to contract with Relators to help market the products, using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

217. The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for Membrane Wrap and Membrane Wrap-Hydro is 15%.

218. BLS actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical hires and pays commissions to TPMs as independent contractors to market Membrane Wrap and Membrane Wrap-Hydro.

219. BLS actually knows, recklessly disregards, or is deliberately ignorant that Progress Medical paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of Membrane Wrap and Membrane Wrap-Hydro sales.

220. BLS does not exercise sufficient control over the conduct of its independent contractor sales representatives. Instead, it has illegally received, and continues to illegally receive, commissions to sell CTPs, and it has illegally paid, and continues to illegally pay, commissions to sell CTPs. By doing so, it has caused

Complaint

and continues to cause the submission of false claims for those products to Government health care programs and commercial insurers. If those payors had been aware of BLS's illegal conduct, they would have denied the claims for payment.

### C.   World Reach Health, LLC

221.   World Reach Health, LLC ("World") is the exclusive distributor that has contracted with Laboratory Defendant HealthTech to sell DermaBind FM, DermaBind TL, and other CTPs to providers. Both World and HealthTech are subsidiaries of common parent companies.

222.   World subcontracts with TPMs, including Progress Medical, to market DermaBind FM and DermaBind TL. World hires the TPMs as independent contractors to market those CTPs in exchange for commissions based on the value or volume of referrals for CTPs.

223.   Progress Medical sought to contract with Relators to help market the products, using its Updated Sales Agreement. Exhibit A, at section 2.2, specifies that the relationship between Progress Medical and Relators would be "that of independent contractors" and not an employer-employee relationship.

224.   The final page of Exhibit A lists the commission rates for "Progress Medical Referral Program[.] [Relators'] referral fee is based on the above table, calculated on net dollars collected[.]" The listed referral fee for DermaBind FM and DermaBind TL is 15%.

225.   On June 18, 2025, Mr. Pollak sent an e-mail to Relator Prins stating that World was one of two parties "threatening [to] tak[e a provider] to collections, due to non-payment and not providing supporting documentation substantiating reason for non-payment. That includes original claims, denial remits, appeals or resubmission of claims with entire timeline of documentation for each unpaid invoice." World knows and relies upon providers to submit claims for payment to government and commercial payors for these CTPs. If there was no knowledge of

Complaint

53

or reliance on this practice, World would not have waited to collect on invoices that were considered past due under their sales agreements.

226.   World actually knows, recklessly disregards, or is deliberately ignorant that TPMs, including Progress Medical, hire and pay commissions to TPMs as independent contractors to market DermaBind FM and DermaBind TL.

227.   World actually knows, recklessly disregards, or is deliberately ignorant that TPMs, including Progress Medical, paid, and continues to pay, TPMs commissions based on the percentage of revenue collected, which is dependent on the value and volume of DermaBind FM and DermaBind TL sales.

228.   World does not exercise sufficient control over the conduct of its independent contractor sales representatives. Instead, it has illegally received, and continues to illegally receive, commissions to sell CTPs, and it has illegally paid, and continues to illegally pay, commissions to sell CTPs. By doing so, it has caused and continues to cause the submission of false claims for those products to Government health care programs and commercial insurers. If those payors had been aware of World's illegal conduct, they would have denied the claims for payment.

### D.    Venture Medical LLC

229.   Venture Medical LLC ("Venture") is a third-party marketer that contracts with Laboratory Defendants BioStem Technologies, Inc. and/or Direct Biologics, Inc. to market AmnioWrap Two, Vendaje AC, and other CTPs to providers.

230.   Venture is a competitor to Progress Medical LLC and has implemented a similar business practice of recruiting independent contractors to market its CTPs in exchange for commissions based on the value or volume of referrals for CTPs.

231.   Venture does not exercise sufficient control over the conduct of its independent contractor sales representatives. Instead, it has illegally received, and continues to illegally receive, commissions to sell CTPs, and it has illegally paid,

54

Complaint

and continues to illegally pay, commissions to sell CTPs. By doing so, it has caused and continues to cause the submission of false claims for those products to Government health care programs and commercial insurers. If those payors had been aware of Venture's illegal conduct, they would have denied the claims for payment.

**CAUSES OF ACTION**
**Count I**
**31 U.S.C. § 3729(a)(1)(A)**

232. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

233. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

234. During the relevant time period, Defendants violated the FCA, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval to the United States.

235. The United States, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

236. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

237. Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count II**
**31 U.S.C. § 3729(a)(1)(B)**

238. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

239. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

Complaint

240. Defendants have violated the FCA, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States, and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of the Defendants' statements and actions.

241. These false records and statements include false certifications on provider agreements and CMS 1500 forms indicating that claims, including claims for skin graft procedures, skin graft supplies, and other services/supplies comply with the AKS and other Medicare and Medicaid laws, regulations, and program instructions, when, in fact, those claims do not.

242. The United States, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

243. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

244. Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

245. Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count III
## 31 U.S.C. § 3729(a)(1)(G)

246. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

247. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

248. Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the United

Complaint

States and they have concealed and improperly avoided an obligation to pay money to the United States, including specifically Defendants' obligation to report and repay past overpayments of claims for which Defendants knew they were not entitled, and such repayments were properly due and owing to the United States.

249.    The United States, unaware of the concealment by the Defendants, has not made demand for or collected the overpayments due from the Defendants.

250.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

251.    Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count IV
### 31 U.S.C. § 3729(a)(1)(C)

252.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

253.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

254.    The Laboratory Defendants and Third-Party Marketer Defendants, acting in concert, conspired to present or cause to be presented false or fraudulent claims for payment or approval to the United States in violation of the AKS and EKRA, and in violation of the above-cited provisions of the FCA.

255.    The United States, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, and unaware of Defendants' conspiracy to violate the FCA, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

256.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

257.    Additionally, the United States is entitled to the maximum penalty, as

57

Complaint

adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count V**
**Cal. Gov. Code § 12651(a)(1)**

258.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

259.   This is a claim for treble damages and penalties under the California False Claims Act ("CAFCA"), Cal. Gov. Code § 12650, *et seq.*, as amended.

260.   Defendants have violated the CAFCA, Cal. Gov. Code § 12651(a)(1), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

261.   The State of California, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

262.   By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

263.   Additionally, the State of California is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count VI**
**Cal. Gov. Code § 12651(a)(2)**

264.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

265.   This is a claim for treble damages and penalties under the CAFCA, Cal. Gov. Code § 12650, *et seq.*, as amended.

266.   Defendants have violated the CAFCA, Cal. Gov. Code § 12651(a)(2), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of

Complaint

California.

267. The State of California, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

268. By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

269. Additionally, the State of California is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count VII
## Cal. Gov. Code § 12651(a)(7)

270. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

271. This is a claim for treble damages and penalties under the CAFCA, Cal. Gov. Code § 12650, *et seq.*, as amended.

272. By and through the acts described above, Defendants have violated the CAFCA, Cal. Gov. Code § 12651(a)(7) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay money to the State of California and they have concealed and improperly avoided an obligation to pay money to the State of California, including specifically Defendants' obligation to report and repay all reimbursements paid to Defendants for medical services rendered under the Medi-CAL program for which Defendants knew they were not entitled, and such repayments were properly due and owing to the State of California.

273. The State of California, unaware of the concealment by the Defendants, has not made demand for or collected the overpayments due from the Defendants.

Complaint

274.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

275.    Additionally, the State of California is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count VIII
## Cal. Gov't Code § 12651(a)(8)

276.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

277.    This is a claim for treble damages and penalties under the CAFCA, Cal. Gov't Code §§ 12650, et seq., as amended.

278.    Defendants have violated the CAFCA, Cal. Gov't Code § 12651(a)(8), by subsequently discovering the falsity of an inadvertent false claim, and by failing to disclose the false claim to the State of California within a reasonable time after discovery of the false claim.

279.    The State of California, unaware of the failure to disclose by the Defendants, has not made demand for or collected the payments due from the Defendants.

280.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

281.    Additionally, the State of California is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count IX
## Cal. Gov. Code § 12651(a)(3)

282.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

60

Complaint

283. This is a claim for treble damages and penalties under the CAFCA, Cal. Gov. Code § 12650, *et seq*, as amended.

284. Laboratory and Third-Party Marketer Defendants, acting in concert, conspired to present or cause to be presented false or fraudulent claims for payment or approval to the State of California, including claims for reimbursement to Medi-CAL in violation of the above provisions of the CAFCA.

285. The State of California, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, and unaware of Defendants' conspiracy to violate the CAFCA, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

286. By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

287. Additionally, the State of California is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count X**
**Cal. Ins. Code § 1871.7(b)**

288. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

289. This is a claim for treble damages and penalties under the California Insurance Fraud Prevention Act, Cal. Ins. Code § 1871, *et seq.*, as amended.

290. Defendants have violated the California IFPA, Cal. Ins. Code § 1871.7, and the California Penal Code Sections 549 and 550, by (a) referring patients and doctors to Defendant Laboratories in exchange for commission payments to Defendant Third-Party Marketers in violation of the federal AKS, California AKS, and EKRA, (b) conspiring to conceal those violations, (c) providing false information to health insurance companies, and (d) concealing the scheme from

61

Complaint

doctors, patients, health insurance companies, and the State of California. Each act caused false claims to be submitted to private health insurance companies within the State of California.

291. These private health insurance companies, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, and unaware of the illicit referral scheme, have paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

292. By reason of Defendants' acts, these private health insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

293. Additionally, the State of California is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XI
## Colo. Rev. Stat. § 25.5-4-305(1)(a)

294. Relators re-allege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

295. This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act ("COMFCA"), Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq.*, as amended.

296. Defendants have violated the COMFCA, Colo. Rev. Stat. § 25.5-4-305(1)(a), by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval.

297. The State of Colorado, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

298. By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

Complaint

299.  Additionally, the State of Colorado is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XII
## Colo. Rev. Stat. § 25.5-4-305(1)(b)

300.  Relators re-allege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

301.  This is a claim for treble damages and penalties under the COMFCA, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq.*, as amended.

302.  Defendants have violated the COMFCA, Colo. Rev. Stat. § 25.5-4-305(1)(b), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Colorado.

303.  The State of Colorado, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

304.  By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

305.  Additionally, the State of Colorado is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XIII
## Colo. Rev. Stat. § 25.5-4-305(1)(f)

306.  Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

307.  This is a claim for treble damages and penalties under the COMFCA, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq.*, as amended.

308.  Defendants have violated the COMFCA, Colo. Rev. Stat. § 25.5-4-305(1)(f), by knowingly making, using, or causing to be made or used a false record

Complaint

or statement material to an obligation to pay or transmit money to the State of Colorado in connection with the "Colorado Medical Assistance Act," and they have concealed and improperly avoided an obligation to pay money to the State of Colorado.

309. The State of Colorado, unaware of the concealment by the Defendants, has not made demand for or collected the payments due from the Defendants.

310. By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

311. Additionally, the State of Colorado is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count XIV**
**Colo. Rev. Stat. § 25.5-4-305(1)(g)**

312. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

313. This is a claim for treble damages and penalties under the COMFCA, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq.*, as amended.

314. Laboratory and Third-Party Marketer Defendants, acting together in concert, have violated the COMFCA, Colo. Rev. Stat. § 25.5-4-305(1)(g), by conspiring to defraud the State of Colorado, including through violations of Colo. Rev. Stat. §§ 25.5-4-305(1)(a), 25.5-4-305(1)(b), and 25.5-4-305(1)(f).

315. The State of Colorado, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

316. By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

317. Additionally, the State of Colorado is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

64

Complaint

## Count XV
## Del. Code Ann. tit. 6, § 1201(a)(1)

318. Relators re-allege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

319. This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act ("DEFCRA"), Del. Code Ann. tit. 6, § 1201, *et seq.*, as amended.

320. Defendants have violated the DEFCRA, Del. Code Ann. tit. 6, § 1201(a)(1), by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval.

321. The State of Delaware, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

322. By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

323. Additionally, the State of Delaware is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XVI
## Del. Code Ann. tit. 6, § 1201(a)(2)

324. Relators re-allege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

325. This is a claim for treble damages and penalties under the DEFCRA, Del. Code Ann. tit. 6, § 1201, *et seq.*, as amended.

326. Defendants have violated the DEFCRA, Del. Code Ann. tit. 6, § 1201(a)(2), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware.

Complaint

327. The State of Delaware, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

328. By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

329. Additionally, the State of Delaware is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XVII
## Del. Code Ann. tit. 6, § 1201(a)(7)

330. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

331. This is a claim for treble damages and penalties under the DEFCRA, Del. Code Ann. tit. 6, § 1201, *et seq.*, as amended.

332. Defendants have violated the DEFCRA, Del. Code Ann. tit. 6, § 1201(a)(7), by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money to the State of Delaware and they have concealed and improperly avoided an obligation to pay money to the State of Delaware.

333. The State of Delaware, unaware of the concealment by the Defendants, has not made demand for or collected the payments due from the Defendants.

334. By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

335. Additionally, the State of Delaware is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

66

Complaint

**Count XVIII**
**Del. Code Ann. tit. 6, § 1201(a)(3)**

336. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

337. This is a claim for treble damages and penalties under the DEFCRA, Del. Code Ann. tit. 6, § 1201, *et seq.*, as amended.

338. Laboratory and Third-Party Marketer Defendants, acting together in concert, have violated the DEFCRA, Del. Code Ann. tit. 6, § 1201(a)(3), by conspiring to defraud the State of Delaware, including through violations of Del. Code Ann. tit. 6, §§ 1201(a)(1), 1201(a)(2), and 1201(a)(7).

339. The State of Delaware, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

340. By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

341. Additionally, the State of Delaware is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count XIX**
**Fla. Stat. § 68.082(2)(a)**

342. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

343. This is a claim for treble damages and penalties under the Florida False Claims Act ("FLFCA"), Fla. Stat. § 68.081, *et seq.*, as amended.

344. Defendants have violated the FLFCA, Fla. Stat. § 68.082(2)(a), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

345. The State of Florida, unaware of the falsity of all such claims made or

67

Complaint

caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

346. By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

347. Additionally, the State of Florida is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

### Count XX
### Fla. Stat. § 68.082(2)(b)

348. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

349. This is a claim for treble damages and penalties under the FLFCA, Fla. Stat. § 68.081, *et seq.*, as amended.

350. Defendants have violated the FLFCA, Fla. Stat. § 68.082(2)(b), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida.

351. The State of Florida, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

352. By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

353. Additionally, the State of Florida is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

### Count XXI
### Fla. Stat. § 68.082(2)(g)

354. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

355. This is a claim for treble damages and penalties under the FLFCA, Fla.

Complaint

Stat. § 68.081, *et seq.*, as amended.

356. By and through the acts described above, Defendants have violated the FLFCA, Fla. Stat. § 68.082(2)(g) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay money to the State of Florida and they have concealed and improperly avoided an obligation to pay money to the State of Florida, including specifically Defendants' obligation to report and repay all fees paid to Defendants for laboratory testing and other services under the Florida Medicaid program for which Defendants knew they were not entitled, and such repayments were properly due and owing to the State of Florida.

357. The State of Florida, unaware of the concealment by the Defendants, has not made demand for or collected the overpayments due from the Defendants.

358. By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

359. Additionally, the State of Florida is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXII
### Fla. Stat. § 68.082(2)(c)

360. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

361. This is a claim for treble damages and penalties under the FLFCA, Fla. Stat. § 68.081, et seq., as amended.

362. Laboratory and Third-Party Marketer Defendants, acting together in concert, have violated the FLFCA, Fla. Stat. § 68.082(2)(c), by conspiring to defraud the State of Florida, including through violations of Fla. Stat. §§ 68.082(2)(a), 68.082(2)(b), and 68.082(2)(g).

363. The State of Florida, unaware of Defendants' conspiracy, has paid and

Complaint

continues to pay claims that would not be paid but for Defendants' illegal conduct.

364.   By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

365.   Additionally, the State of Florida is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXIII
## 740 Ill. Comp. Stat. 175/3(a)(1)(A)

366.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

367.   This is a claim for treble damages and penalties under the Illinois False Claims Act ("ILFCA"), 740 Ill. Comp. Stat. 175/1, *et seq.*, as amended.

368.   Defendants have violated the ILFCA, 740 Ill. Comp. Stat. 175/3(a)(1)(A), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

369.   The State of Illinois, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

370.   By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

371.   Additionally, the State of Illinois is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXIV
## 740 Ill. Comp. Stat. 175/3(a)(1)(B)

372.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

373.   This is a claim for treble damages and penalties under the ILFCA, 740 Ill. Comp. Stat. 175/1, *et seq.*, as amended.

70

Complaint

374. Defendants have violated the ILFCA, 740 Ill. Comp. Stat. 175/3(a)(1)(B), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Illinois.

375. The State of Illinois, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

376. By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

377. Additionally, the State of Illinois is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count XXV**
**740 Ill. Comp. Stat. 175/3(a)(1)(G)**

378. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

379. This is a claim for treble damages and penalties under the ILFCA, 740 Ill. Comp. Stat. 175/1, *et seq.*, as amended.

380. Defendants have violated the ILFCA, 740 Ill. Comp. Stat. 175/3(a)(1)(G) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay money to the State of Illinois and they have concealed and improperly avoided an obligation to pay money to the State of Illinois, including specifically Defendants' obligation to report and repay all fees paid to Defendants for laboratory testing and other services under the Illinois Medicaid program for which Defendants knew they were not entitled, and such repayments were properly due and owing to the State of Illinois.

381. The State of Illinois, unaware of the concealment by the Defendants, has not made demand for or collected the overpayments due from the Defendants.

Complaint

382. By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

383. Additionally, the State of Illinois is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXVI
### 740 Ill. Comp. Stat. 175/3(a)(1)(C)

384. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

385. This is a claim for treble damages and penalties under the ILFCA, 740 Ill. Comp. Stat. 175/1, et seq., as amended.

386. Laboratory and Third-Party Marketer Defendants, acting together in concert, have violated the ILFCA, 740 Ill. Comp. Stat. 175/3(a)(1)(C), by conspiring to defraud the State of Illinois including through violations of 40 Ill. Comp. Stat. 175/3(a)(1)(A), 175/3(a)(1)(B), and 175/3(a)(1)(G).

387. The State of Illinois, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

388. By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

389. Additionally, the State of Illinois is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXVII
### 740 Ill. Comp. Stat. 92/5

390. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

391. This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act ("ICFPA"), 740 Ill. Comp. Stat. 92/1, *et seq.*, as amended.

72

Complaint

392.   Defendants have violated the Illinois ICFPA, 740 Ill. Comp. Stat. 92/5, and the Illinois Criminal Code, 720 Ill. Comp. Stat. 5/17-8.5 & 5/17-10.5, by (a) referring patients and doctors to Defendant Laboratories in exchange for commission payments in violation of the federal AKS, California AKS, and EKRA, (b) organizing and participating in a conspiracy to conceal those violations, (c) providing false information to health insurance companies and the State of Illinois, and (d) concealing the scheme from doctors, patients, health insurance companies, and the State of Illinois.  Each act caused false claims to be submitted to private health insurance companies and state healthcare programs within the State of Illinois.

393.   These private health insurance companies and the State of Illinois, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, and unaware of the illicit referral scheme, have paid and continue to pay claims that would not be paid but for Defendants' illegal conduct.

394.   By reason of Defendants' acts, these private health insurance companies and the State of Illinois have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

395.   Additionally, the State of Illinois is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count XXVIII**
**Mich. Comp. Laws § 400.604**

396.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

397.   This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act ("MIMFCA"), Mich. Comp. Laws § 400.601, *et seq.*, as amended.

398.   Defendants have violated the MIMFCA, Mich. Comp. Laws § 400.604,

73

Complaint

by soliciting, offering, or receiving a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part by the Michigan Medicaid program.

399. The State of Michigan, unaware of the kickbacks or bribes made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

400. By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

401. Additionally, the State of Michigan is entitled to the maximum, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXIX
## Mich. Comp. Laws § 400.607(1)

402. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

403. This is a claim for treble damages and penalties under the MIMFCA, Mich. Comp. Laws § 400.601, *et seq.*, as amended.

404. Defendants, acting in concert, have violated the MIMFCA, Mich. Comp. Laws § 400.607(1), by making or presenting, or causing to be made or presented, a claim under the Michigan Medicaid program, upon or against the State of Michigan, knowing the claim to be false.

405. The State of Michigan, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

406. By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

74

Complaint

407.   Additionally, the State of Michigan is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXX
## Mich. Comp. Laws § 400.607(3)

408.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

409.   This is a claim for treble damages and penalties under the MIMFCA, Mich. Comp. Laws § 400.601, *et seq.*, as amended.

410.   Defendants have violated the MIMFCA, Mich. Comp. Laws § 400.607(3), by knowingly making, using, or cause to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Michigan pertaining to a claim presented under the Michigan Medicaid program.

411.   The State of Michigan, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has not made demand for or collected the payments due from the Defendants.

412.   By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

413.   Additionally, the State of Michigan is entitled to the maximum, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXXI
## Mich. Comp. Laws § 400.606

414.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

415.   This is a claim for treble damages and penalties under the MIMFCA, Mich. Comp. Laws § 400.601, et seq., as amended.

75

Complaint

416. Laboratory and Third-Party Marketer Defendants, acting in concert, have violated the MIMFCA, Mich. Comp. Laws § 400.606, by entering into an agreement, combination, or conspiracy to defraud the State of Michigan by obtaining or aiding another to obtain the payment or allowance of a false claim under the Michigan Medicaid program.

417. The State of Michigan, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

418. By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

419. Additionally, the State of Michigan is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count XXXII**
**Minn. Stat. § 15C.02(a)(1)**

420. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

421. This is a claim for treble damages and penalties under the Minnesota False Claims Act ("MNFCA"), Minn. Stat. §§ 15C.01, *et seq.*, as amended.

422. Defendants have violated the MNFCA, Minn. Stat. § 15C.02(a)(1), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

423. The State of Minnesota, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

424. By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at

76

Complaint

trial.

425. Additionally, the State of Minnesota is entitled to the maximum, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXXIII
### Minn. Stat. § 15C.02(a)(2)

426. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

427. This is a claim for treble damages and penalties under the MNFCA, Minn. Stat. §§ 15C.01, *et seq.*, as amended.

428. Defendants the MNFCA, Minn. Stat. § 15C.02(a)(2), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Minnesota.

429. The State of Minnesota, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

430. By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

431. Additionally, the State of Minnesota is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XXXIV
### Minn. Stat. § 15C.02(a)(7)

432. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

433. This is a claim for treble damages and penalties under the MNFCA, Minn. Stat. §§ 15C.01, *et seq.*, as amended.

77

Complaint

434.    Defendants have violated the MNFCA, Minn. Stat. § 15C.02(a)(7), by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Minnesota.

435.    The State of Minnesota, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has not made demand for or collected the payments due from the Defendants.

436.    By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

437.    Additionally, the State of Minnesota is entitled to the maximum, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count XXXV**
**Minn. Stat. § 15C.02(a)(3)**

438.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

439.    This is a claim for treble damages and penalties under the MNFCA, Minn. Stat. §§ 15C.01, et seq., as amended.

440.    Defendants, acting in concert, have violated the MNFCA, Minn. Stat. § 15C.02(a)(2), by conspiring to defraud the State of Minnesota including through violations of Minn. Stat. §§ 15C.01(a)(1)–(2) and 15C.01(a)(7).

441.    The State of Minnesota, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

442.    By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

78

Complaint

443. Additionally, the State of Minnesota is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

### Count XXXVI
### Mont. Code Ann. § 17-8-403(1)(a)

444. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

445. This is a claim for treble damages and penalties under the Montana False Claims Act ("MTFCA"), Mont. Code Ann. § 17-8-401, *et seq.*, as amended.

446. Defendants have violated the MTFCA, Mont. Code Ann. § 17-8-403(1)(a), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

447. The State of Montana, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

448. By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

449. Additionally, the State of Montana is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

### Count XXXVII
### Mont. Code Ann. § 17-8-403(1)(b)

450. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

451. This is a claim for treble damages and penalties under the MTFCA, Mont. Code Ann. § 17-8-401, *et seq.*, as amended.

452. Defendants have violated the MTFCA, Mont. Code Ann. § 17-8-403(1)(b), by knowingly making, using, or causing to be made or used, false records

Complaint

or statements to get false or fraudulent claims paid or approved by the State of Montana.

453. The State of Montana, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

454. By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

455. Additionally, the State of Montana is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count XXXVIII**
**Mont. Code Ann. § 17-8-403(1)(g)**

456. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

457. This is a claim for treble damages and penalties under the MTFCA, Mont. Code Ann. § 17-8-401, *et seq.*, as amended.

458. Defendants have violated the MTFCA, Mont. Code Ann. § 17-8-403(1)(g), by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay money to the State of Montana and they have concealed and improperly avoided an obligation to pay money to the State of Montana, and such repayments were properly due and owing to the State of Montana.

459. The State of Montana, unaware of the concealment by the Defendants, has not made demand for or collected the overpayments due from the Defendants.

460. By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

461. Additionally, the State of Montana is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

Complaint

## Count XXXIX
## Mont. Code Ann. § 17-8-403(1)(c)

462. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

463. This is a claim for treble damages and penalties under the MTFCA, Mont. Code Ann. § 17-8-401, et seq., as amended.

464. Laboratory and Third-Party Marketer Defendants, acting together in concert, have violated the MTFCA, Mont. Code Ann. § 17-8-403(1)(c), by conspiring to defraud the State of Montana including through violations of Mont. Code Ann. §§ 17-8-403(1)(a)–(b) and 17-8-403(1)(g).

465. The State of Montana, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

466. By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

467. Additionally, the State of Montana is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XL
## N.M. Stat. Ann. § 44-9-3(A)(1)

468. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

469. This is a claim for treble damages and penalties under the New Mexico Fraud Against Taxpayers Act ("NMFATA"), N.M. Stat. Ann. §§ 44-9-1, et seq., as amended.

470. Defendants have violated the NMFATA, N.M. Stat. Ann. § 44-9-3(A)(1), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

471. The State of New Mexico, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false

Complaint

or fraudulent claims that would not be paid but for Defendants' illegal conduct.

472. By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

473. Additionally, the State of New Mexico is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XLI
## N.M. Stat. Ann. § 44-9-3(A)(2)

474. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

475. This is a claim for treble damages and penalties under the NMFATA, N.M. Stat. Ann. §§ 44-9-1, *et seq.*, as amended.

476. Defendants have violated the NMFATA, N.M. Stat. Ann. § 44-9-3(A)(2), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Mexico.

477. The State of New Mexico, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

478. By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

479. Additionally, the State of New Mexico is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

82

Complaint

## Count XLII
### N.M. Stat. Ann. § 44-9-3(A)(8)

480.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

481.    This is a claim for treble damages and penalties under the NMFATA, N.M. Stat. Ann. §§ 44-9-1, *et seq.*, as amended.

482.    Defendants have violated the N.M. Stat. Ann. § 44-9-3(A)(8), by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay money to the State of New Mexico, and such repayments were properly due and owing to the State of New Mexico.

483.    The State of New Mexico, unaware of the concealment by the Defendants, has not made demand for or collected the overpayments due from the Defendants.

484.    By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

485.    Additionally, the State of New Mexico is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XLIII
### N.M. Stat. Ann. § 44-9-3(A)(3)

486.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

487.    This is a claim for treble damages and penalties under the NMFATA, N.M. Stat. Ann. §§ 44-9-1, et seq., as amended.

488.    Defendants, acting together in concert, have violated the NMFATA, N.M. Stat. Ann. § 44-9-3(A)(3), by conspiring to defraud the State of New Mexico by obtaining approval or payment on a false or fraudulent claim.

83

Complaint

489. The State of New Mexico, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

490. By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

491. Additionally, the State of New Mexico is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count XLIV**
**N.M. Stat. Ann. § 44-9-3(A)(4)**

492. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

493. This is a claim for treble damages and penalties under the NMFATA, N.M. Stat. Ann. §§ 44-9-1, et seq., as amended.

494. Defendants, acting together in concert, have violated the NMFATA, N.M. Stat. Ann. § 44-9-3(A)(4), by conspiring to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State of New Mexico.

495. The State of New Mexico, unaware of Defendants' conspiracy, has not made demand for or collected the overpayments due from the Defendants.

496. By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

497. Additionally, the State of New Mexico is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged

Complaint

herein.

## Count XLV
## N.Y. State Fin. Law § 189(1)(a)

498.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

499.   This is a claim for treble damages and penalties under the New York False Claims Act ("NYFCA"), N.Y. State Fin. Law §§ 187, et seq., as amended.

500.   Defendants have violated the NYFCA, N.Y. State Fin. Law § 189(1)(a), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

501.   The State of New York, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

502.   By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

503.   Additionally, the State of New York is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count XLVI
## N.Y. State Fin. Law § 189(1)(b)

504.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

505.   This is a claim for treble damages and penalties under the NYFCA, N.Y. State Fin. Law §§ 187, et seq., as amended.

506.   Defendants have violated the NYFCA, N.Y. State Fin. Law § 189(1)(b), by knowingly making, using, or causing to be made or used, false records or

85

Complaint

statements material to get false or fraudulent claims paid or approved by the State of New York.

507. The State of New York, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

508. By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

509. Additionally, the State of New York is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

### Count XLVII
### N.Y. State Fin. Law § 189(1)(g)

510. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

511. This is a claim for treble damages and penalties under the NYFCA, N.Y. State Fin. Law §§ 187, et seq., as amended.

512. Defendants have violated the NYFCA, N.Y. State Fin. Law § 189(1)(g), by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay money to the State of New York, and such repayments were properly due and owing to the State of New York.

513. The State of New York, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has not made demand for or collected the overpayments due from Defendants.

514. By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

86

Complaint

515. Additionally, the State of New York is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

### Count XLVIII
### N.Y. State Fin. Law § 189(1)(h)

516. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

517. This is a claim for treble damages and penalties under the NYFCA, N.Y. State Fin. Law §§ 187, et seq., as amended.

518. Defendants have violated the NYFCA, N.Y. State Fin. Law § 189(1)(h), by concealing and improperly avoiding an obligation to pay money to the State of New York, and such repayments were properly due and owing to the State of New York.

519. The State of New York, unaware of the concealment by Defendants, has not made demand for or collected the overpayments due from Defendants.

520. By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

521. Additionally, the State of New York is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

### Count XLIX
### N.Y. State Fin. Law § 189(1)(c)

522. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

523. This is a claim for treble damages and penalties under the NYFCA, N.Y. State Fin. Law §§ 187, et seq., as amended.

Complaint

524. Laboratory and Third-Party Marketer Defendants, acting together in concert, have violated the NYFCA, N.Y. State Fin. Law § 189(1)(c), by conspiring to defraud the State of New York, including through violations of N.Y. State Fin. Law §§ 189(1)(a), 189(1)(b), 189(1)(g), and 189(1)(h).

525. The State of New York, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

526. By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

527. Additionally, the State of New York is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count L
## Tenn. Code Ann. § 4-18-103(a)(1)

528. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

529. This is a claim for treble damages and penalties under the Tennessee False Claims Act ("TNFCA"), Tenn. Code Ann. §§ 4-18-101, *et seq.*, as amended.

530. Defendants have violated the TNFCA, Tenn. Code Ann. § 4-18-103(a)(1), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

531. The State of Tennessee, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

532. By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at

Complaint

trial.

533. Additionally, the State of Tennessee is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count LI
### Tenn. Code Ann. § 4-18-103(a)(2)

534. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

535. This is a claim for treble damages and penalties under the TNFCA, Tenn. Code Ann. §§ 4-18-101, *et seq.*, as amended.

536. Defendants have violated the TNFCA, Tenn. Code Ann. § 4-18-103(a)(2), by knowingly making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Tennessee.

537. The State of Tennessee, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

538. By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

539. Additionally, the State of Tennessee is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count LII
### Tenn. Code Ann. § 4-18-103(a)(7)

540. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

89

Complaint

541. This is a claim for treble damages and penalties under the TNFCA, Tenn. Code Ann. §§ 4-18-101, *et seq.*, as amended.

542. Defendants have violated the TNFCA, Tenn. Code Ann. § 4-18-103(a)(7), by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the State of Tennessee, and such repayments were properly due and owing to the State of Tennessee.

543. The State of Tennessee, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has not made demand for or collected the overpayments due from Defendants.

544. By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

545. Additionally, the State of Tennessee is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count LIII
### Tenn. Code Ann. § 4-18-103(a)(9)

546. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

547. This is a claim for treble damages and penalties under the TNFCA, Tenn. Code Ann. §§ 4-18-101, et seq., as amended.

548. Defendants have violated the TNFCA, Tenn. Code Ann. § 4-18-103(a)(9), by knowingly making, using, or causing to be made or used any false conduct, representation, or practice in order to procure anything of value directly or indirectly from the State of Tennessee.

549. The State of Tennessee, unaware of the falsity of the conduct,

Complaint

representation, and practice made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

550. By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

551. Additionally, the State of Tennessee is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count LIV**
**Tenn. Code Ann. § 4-18-103(a)(3)**

552. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

553. This is a claim for treble damages and penalties under the TNFCA, Tenn. Code Ann. §§ 4-18-101, et seq., as amended.

554. Laboratory and Third-Party Marketer Defendants, acting together in concert, have violated the TNFCA, Tenn. Code Ann. § 4-18-103(a)(3), by conspiring to defraud the State of Tennessee, including through violations of Tenn. Code Ann. §§ 4-18-103(a)(1)–(2) and 4-18-103(a)(7).

555. The State of Tennessee, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

556. By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

557. Additionally, the State of Tennessee is entitled to the maximum civil penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

Complaint

## Count LV
### Tex. Hum. Res. Code. Ann. § 36.002(1)

558.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

559.   This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code. Ann. §§ 36.001, et seq., as amended.

560.   Defendants have violated the TMFPA, Tex. Hum. Res. Code. Ann. § 36.002(1), by knowingly making, or causing to be made, false statements or misrepresentations of material facts to permit them to receive benefits or payments under the Texas Medicaid program that are not authorized or that are greater than the benefits or payments that are authorized.

561.   The State of Texas, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

562.   By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

563.   Additionally, the State of Texas is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count LVI
### Tex. Hum. Res. Code. Ann. § 36.002(2)

564.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

565.   This is a claim for treble damages and penalties under the TMFPA, Tex. Hum. Res. Code. Ann. §§ 36.001, et seq., as amended.

566.   Defendants have violated the TMFPA, Tex. Hum. Res. Code. Ann. § 36.002(2), by knowingly concealing or failing to disclose information that permits them to receive benefits or payments under the Medicaid program that are not

Complaint

authorized or that are greater than the benefits or payments that are authorized.

567. The State of Texas, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

568. By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

569. Additionally, the State of Texas is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count LVII**
**Tex. Hum. Res. Code. Ann. § 36.002(5)**

570. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

571. This is a claim for treble damages and penalties under the TMFPA, Tex. Hum. Res. Code. Ann. §§ 36.001, et seq., as amended.

572. Defendants have violated the TMFPA, Tex. Hum. Res. Code. Ann. § 36.002(5), by knowingly paying, charging, soliciting, accepting, or receiving, in addition to an amount paid and authorized under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Texas Medicaid program.

573. The State of Texas, unaware of Defendants' acts and the inappropriate illegal commission compensation structure underlying each claim, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

574. By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

575. Additionally, the State of Texas is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

Complaint

## Count LVIII
### Tex. Hum. Res. Code. Ann. § 36.002(12)

576.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

577.    This is a claim for treble damages and penalties under the TMFPA, Tex. Hum. Res. Code. Ann. §§ 36.001, et seq., as amended.

578.    Defendants have violated the TMFPA, Tex. Hum. Res. Code. Ann. § 36.002(12), by knowingly making, using, or causing the making or using of a false record or statement material to an obligation to pay or transmit money or property to Texas under the Medicaid program, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to Texas under the Medicaid program.

579.    The State of Texas, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

580.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

581.    Additionally, the State of Texas is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count LIX
### Tex. Hum. Res. Code. Ann. § 36.002(13)

582.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

583.    This is a claim for treble damages and penalties under the TMFPA, Tex. Hum. Res. Code. Ann. §§ 36.001, et seq., as amended.

584.    Defendants have violated the TMFPA, Tex. Hum. Res. Code. Ann. § 36.002(13), by knowingly engaging in conduct that constitutes a violation under Tex. Hum. Res. Code. Ann. § 32.039(b), including presenting claims that contain

94

Complaint

statements that Defendants know to be false, and also offering, paying, soliciting, or receiving remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce referrals for items or services for which payment may be made, in whole or in part, under the Texas Medicaid program.

585. The State of Texas, unaware of the falsity of all such claims made or caused to be made by Defendants, and unaware of the kickbacks arranged and exchanged by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

586. By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

587. Additionally, the State of Texas is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## Count LX
### Tex. Hum. Res. Code. Ann. § 36.002(9)

588. Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

589. This is a claim for treble damages and penalties under the TMFPA, Tex. Hum. Res. Code. Ann. §§ 36.001, et seq., as amended.

590. Laboratory and Third-Party Marketer Defendants, acting together in concert, have violated the TMFPA, Tex. Hum. Res. Code. Ann. § 36.002(9), by conspiring to defraud the State of Texas, including through violations of Tex. Hum. Res. Code. Ann. 36.002(1), 36.002(2), 36.002(5), 36.002(12), and 36.002(13).

591. The State of Texas, unaware of Defendants' conspiracy, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

592. By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

593. Additionally, the State of Texas is entitled to the maximum penalty, as

Complaint

adjusted by applicable inflation laws, for each and every violation alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relators pray for judgment against Defendants as follows:

A.    That Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, each of the States' False Claims Acts, *supra*, the California IFPA, Cal. Ins. Code § 1871, *et seq.*, and the Illinois ICFPA, 740 Ill. Comp. Stat. 92/1, *et seq.*;

B.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages sustained by the United States, each of the States, and commercial insurers because of Defendants' actions, plus the maximum civil penalty, as adjusted by inflation,  for each violation of each of the FCAs, the California IFPA, and the Illinois ICFPA;

C.    That Plaintiff-Relators be awarded the maximum amount allowed pursuant to the FCAs, the California IFPA, and the Illinois ICFPA;

D.    That this Court order other injunctive relief, including a permanent injunction enjoining Defendants, their agents, successors, and employees from engaging in each unlawful practice set forth above, and for such other injunctive relief as the Court may deem proper;

E.    That Plaintiff-Relators be awarded all attorneys' fees, costs, and expenses; and

F.    That the United States, the States, and Relators recover such other and further relief as the Court deems just and proper.

Complaint

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury in this case.

Dated: July 25, 2025

/s/ Michael A. Hirst
Michael A. Hirst, Esq.
michael.hirst@hirstlawgroup.com
Marisela Bernal, Esq.
marisela.bernal@hirstlawgroup.com
Hirst Law Group, P.C.
200 B Street, Suite A
Davis, California 95616
P: (530) 756-7700
F: (530) 756-7707

Counsel for Plaintiff-Relators
Sunil Wadhwa and Emily Prins

Complaint

# Exhibit A

*U.S., et al., ex rel. Wadhwa, et al.*
*v. Progress Medical LLC, et al.*
(filed under seal)

Exhibit A
Page 98

## <u>NON-EXCLUSIVE SALES AGENT AND PERSONAL SERVICES AGREEMENT</u>

This Non-Exclusive Sales Agent and Personal Services Agreement (the "Agreement"), effective this day of _____, (the "Effective Date"), is made and entered into by and between the below-listed Agent and Company.

**SALES AGENT:**          _____(the "Agent"), whose address is:

_____

_____

**COMPANY:**                              **Progress Medical LLC** (the "Company"), with its head office located at:
**10400 Spring Green Dr., Suite 112**
**Englewood, CO 80112**

## <u>RECITALS</u>

WHEREAS, Company wishes to appoint Agent as its non-exclusive Agent for Products (as defined below); and

WHEREAS, Agent has represented to Company that he or she has the facilities, and expertise required for the successful marketing of the Products and wishes to act as Company's Agent for the Products; and

WHEREAS, Agent agrees to provide certain personal services, including marketing and sales consultation with end users of Company products.

NOW, THEREFORE, in consideration of the foregoing and the promises, representations, and warranties set forth below, the parties agree as follows:

## <u>AGREEMENT</u>

In consideration of the foregoing and of the mutual promises contained in this Agreement, the parties agree as follows:

## 1. <u>Definitions</u>

1.1. **"Products"** shall mean those products listed in Exhibit A attached to this Agreement. Products may be changed, abandoned or added by Company, in its sole discretion, anytime. Company shall be under no obligation to continue production of any Product.

Exhibit A
Page 99

1.2. **"Confidential Information"** means all data and information of a confidential and proprietary nature, including any proprietary information, technical data, trade secrets or knowhow, including, but not limited to, research, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information of Company communicated, orally, electronically, or in writing, to Agent and identified by Company as confidential, whether or not designated in writing as such.

## 2. Appointment and Authority of Agent

2.1. **Non-Exclusive Agent.** Subject to the terms and conditions of this Agreement, the Company hereby appoints Agent as a Company's Non-Exclusive Agent for the Products, and Agent hereby accepts such appointment. Agent's sole authority shall be to solicit orders for the Products in accordance with all applicable laws, rules, regulations, and the terms of this Agreement. Agent shall not have the authority to make any commitments whatsoever on behalf of the Company.

2.2. **Independent Contractors.** The relationship of the Company and Agent established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the parties as partners, co-owners or otherwise as participants in a joint undertaking, or (iii) allow Agent to create or assume any obligation on behalf of the Company for any purpose whatsoever. All financial and other obligations associated with Agent's business are the sole responsibility of Agent. Agent shall be solely responsible for, and shall indemnify and hold the Company free and harmless from, any and all claims, damages or lawsuits (including the Company's attorneys' fees) arising out of unauthorized, illegal, unethical, or negligent acts of Agent/Agent.

## 3. Obligations of the Parties

3.1. **General Conduct of Agent.** Agent shall use his or her best efforts to legally promote and sell the Products, and shall, at his or her sole cost, expense, and risk: (i) maintain suitable organization for and use his or her best efforts to actively promote and sell the Company's Products. Exhibit A lists the Products and the MSRP for each product.

3.2. **Training.** Agent agrees to promote the Product only for use by physicians, or other healthcare providers legally allowed to use such products. Education, and/or training will be offered by the Company.

3.3. **Notification.** During the term of this Agreement, if Agent becomes aware of any use or attempted use of the Products by anyone who is not trained as described herein, then Agent will promptly notify Company of such use and will promptly disclose all facts, circumstance, and knowledge of such use to Company.

3.4. **Forecasts.** Agent shall meet with Company at agreed upon times to discuss sales and marketing activities and to provide a forecast of anticipated sales.

3.5. **Performance of Obligations** Agent understands, acknowledges, and agrees that the continued maintenance of an image of excellence and a high level of ethical marketing of the Products is essential to the continued success of both parties hereto. Accordingly, Agent hereby agrees that he or she shall, at all times: (i) conduct business in a manner that reflects favorably on the Products, good name, goodwill, and reputation of Company; (ii) avoid deceptive, misleading, or unethical practices that are or might be detrimental to Company, the Product, or the public; (iii) make no false or misleading representations, either orally or in any written materials, with regard to Company or the Product, using only Company-approved claims in all advertising, publicity and marketing materials **(Company has a zero-tolerance for any off-label promotion by any Agent)**; (iv) not publish or employ, or cooperate in the publication or employment of, any misleading or deceptive advertising material with regard to Company or the Product; (v) make no representations, warranties, or guarantees to customers or to the trade with respect to the specifications, indications, capabilities, or features of the Product that are inconsistent with the literature distributed by Company; (vi) not enter into any contract or engage in any practice detrimental to the interests of Company or the Product; (vii) Agent is required to act in the best interest of the Company at all times and in all interactions or encounters. Violation of any of the provisions of this Section shall constitute a material breach of this agreement.

3.6. **Compliance.** Agent shall at all times during the term of this Agreement strictly comply with all applicable regulatory laws governing the Agent, promotion, marketing, training and sale of the Product, including compliance with all applicable regulatory standards. Such compliance shall include, but shall not be limited to, the following duties:

3.6.1. Except as provided below, Company shall be responsible for applicable medical products regulatory approvals as required by law;

3.6.2. Agent agrees not to sell or distribute the Product in any geographical area which requires a license or approval until such time as appropriate licenses or approvals have been obtained;

3.6.3. Agent agrees to receive notifications from his or her customers or any applicable physician or healthcare practitioner regarding complaints and adverse events with respect to the Product marketed by Agent. Agent shall, within forty-eight (48) hours, or as soon as possible, of receipt of such notification, provide Company with all necessary information required by Company;

3.6.4. Agent shall forward to physicians or healthcare providers any required communications or notifications originated by, and at the request of, the Company. Agent shall provide written confirmation of having delivered such requested communications or notifications to physicians within a reasonable period of time subsequent to delivery;

3.6.5. Agent shall provide all personal services identified in this Agreement or requested by Company;

3.6.6. Agent is required to exclusively use Company-issued marketing materials and assets; and

3.7. **Marketing Materials.** Company will provide a digital copy of standard English language marketing or promotion materials to Agent to be used in Product sales efforts by Agent. Agent

shall use only marketing materials which are provided by Company.  Any proposed changes to any marketing material must be provided to Company for prior-approval.

3.8. **Availability of Products.** Company reserves the right at any time to discontinue the manufacture, supply, or sale of the Product, and subject to appropriate regulatory approvals, to make changes in materials or design to the Product. Products may be upgraded, enhanced, changed, abandoned or added by Company, at its sole discretion.

3.9. **Sales to U.S. Institutions and Agencies.** Sales to US government institutions, subsidiaries, contractors or agents is only permitted on a case by case basis and when written approval has been granted by company.

3.10. **Additional Responsibilities.** It is hereby agreed by the parties hereto that each of them is entering into this Agreement based on his or her own capacities, resources, and abilities. Therefore, Company will not be responsible for the non-compliance of Agent's obligations and duties. Similarly, Agent will not be responsible for the noncompliance of Company' obligations and duties pursuant to this Agreement. Each party will pay any costs and expenses incurred during the performance of his or her respective obligations under this Agreement.

## 4. Compensation

4.1. **Sole Compensation - Company Billing.** Agent's sole compensation under the terms of this Agreement shall be a commission computed in accordance with the methodology set forth in Exhibit A attached to this Agreement. The commission shall apply to all orders solicited by the Agent that have been accepted by the Company and for which a valid purchase order has been received. Commissions shall be computed on the net amount billed by the Company to the customer, and no commission shall be paid with respect to charges for handling, freight, sales taxes, C.O.D. charges, insurance, import duties, trade discounts, repairs, and other similar charges and expenses. All commissions for sales from a calendar month shall be paid by the 15th of the following month if payment has been received from provider/customer.

4.2. **Monthly Statements.** The Company shall provide the Agent access monthly reports for the agent to inspect what items their client has ordered.

## 5. Sale of the Products

5.1. **Prices and Terms of Sale.** The Company shall provide Agent with copies of his or her current price lists, his or her delivery schedules, and his or her standard terms and conditions of sale, as established from time to time. Agent shall not quote to customers any prices below the MSRP without expressed written consent from Company.

5.2. **Price Changes.** The Company may alter at will the prices, delivery schedules, and terms and conditions, provided only that it gives prior written notice to Agent of any changes. Each ordershall be governed by the prices, delivery schedules, and terms and conditions in effect at the time the order is accepted, and all quotations made to customers by Agent shall contain a statement to that effect.

Exhibit A

5.3. **Quotations.** Upon request of the Company and if applicable, Agent shall, within five (5) days of submission, furnish to Company copies of all quotations submitted to customers. Each quotation shall be consistent with the terms of this Agreement.

5.4. **Acceptance.** All orders obtained by Agent shall be subject to acceptance by the Company at its principal office currently located at the address listed for the Company in this Agreement. Agent shall have no authority to make any acceptance or delivery commitments to customers. The Company specifically reserves the right to reject any

## 6. Product Warranty and Product Availability

6.1. **Product Warranty.** Any warranty for the Products shall run directly from the Company to the customer, and pursuant to the warranty the customer shall return any allegedly defective Products directly to the Company. Agent shall have no authority to accept any returned Products or to make any warranties with respect to the Products.

6.2. **Product Availability.** Under no circumstances shall the Company be responsible to Agent or any other party for its failure to fill accepted orders, or for its delay in filling accepted orders.

## 7. Additional Responsibilities of Agent

7.1. **Forecasts.** Upon request of the Company, within the first five (5) days of each month as an Agent; Agent shall provide the Company with a thirty (30) day rolling forecast of orders.

7.2. **Promotion of the Products.** Agent shall, at his or her own expense, perform the personal services set forth herein, and legally promote the sale of and stimulate demand for the Products by direct solicitation. Agent agrees that any and all promotion shall be in accordance with the Products' AATB Guidelines. In no event shall Agent make any representation, guarantee or warranty concerning the Products except as expressly authorized by the Company.

7.3. **Customer Service.** Agent shall diligently assist the customers' personnel in using the Products and shall perform such additional customer services as required by customer, and as the Company may reasonably request, consistent with the personal services nature of this Agreement.

7.4. **Advising of Changes.** Agent shall promptly advise the Company of (i) any material changes in Agent's status (ii) any political, financial, legislative, industrial or other events that could affect the mutual business interests of Agent and the Company, whether harmful or beneficial.

7.5. **Expense of Doing Business.** Agent shall bear the entire cost and expense of conducting his or her business in accordance with the terms of this Agreement.

7.6. **Tracking.** Company shall maintain a detailed tracking system enabling Agent to track Product by customer or physician name and address.

7.7. **Communication with Manufacturers.** Agent at no time shall communicate directly with Company's manufacturers. This is considered a direct violation of the Agreement and resulting in immediate termination with cause.

**8.**  **Additional Obligations of the Company**

8.1. **Assistance in Promotion.** The Company shall provide Agent with digital marketing and technical information concerning the Products as well as reasonable quantities of brochures (if available), instructional material, advertising literature and other Product data. Agent is required to exclusively use these materials.

8.2. **Assistance in Problems.** The Company agrees to assist Agent and his or her customers in all ways deemed reasonable by Company in the solution of any problems relating to the functioning and use of the Products.

8.3. **Training and Education.** Agent shall complete training sessions held by the Company with permission of the Company. Agent shall be responsible, unless express consent is given from the Company, for expenses incurred to attend training sessions, including, but not limited to, travel and accommodations.

8.4. **New Developments.** The Company agrees to keep Agent informed of any improvements or enhancements to the Products which become commercially available.

**9.**  **Term and Termination**

9.1. **Term.** The term of this Agreement shall commence on the Effective Date and shall continue in effect for an initial term of one (1) year, (the "Term"), unless earlier terminated as set forth herein. Thereafter, this contract shall renew for successive one (1) year terms unless terminated by either party.

9.2. **Termination for Cause or No Cause or "Off-Label" Promotion.** If either party defaults in the performance of any provision of this Agreement, then the non-defaulting party may give immediate written notice to the defaulting party that the Agreement is terminated. Company is under no obligation to pay commissions or overrides to Agent if agent is terminated for Cause. All overrides terminate along with termination of agreement.

9.3. **Termination for Insolvency.** This Agreement shall terminate, without notice, (i) upon the institution by or against Agent for insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Agent's debts, (ii) upon Agent's making an assignment for the benefit of creditors, or (iii) upon Agent's dissolution.

9.4. **Return of Materials.** All trademarks, trade names, patents, copyrights, designs, drawings, formulas or other data, photographs, demonstration units or, literature, and sales aids of every kind shall remain the property of the Company. Within fifteen (15) days after the termination of this Agreement, Agent shall prepare all such items in his or her possession for shipment, as the Company may direct, and ship to the Company at the Company's expense. Agent shall not make or retain any copies of any confidential items or information that may have been entrusted to him or her. Effective upon the termination of this Agreement, Agent shall cease to use all trademarks, marks, and trade names of the Company.

9.5. **Limitation on Liability.** In the event of termination by either party in accordance with any of the provisions of this agreement, neither party shall be liable to the other, because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or her or anticipated sales or on account of expenditures, investments, leases or commitments in connection with the business or goodwill of the company or agent. The company's sole liability under the terms of this agreement shall be for any unpaid commissions under this Agreement.

9.6. **Survival of Certain Terms.** The provisions of Sections 10, 11, 13, 14, and any provision regarding enforcement or breach of this Agreement, including any damages or attorney's fees, shall survive the termination of this Agreement. All other rights and obligations of the parties shall cease upon termination of this Agreement.

## 10. Warranties; Limitation on Liability

10.1. **Power and Authority.** Each party represents and warrants that (i) it has the full right, power and authority to enter into this Agreement and to perform his or her obligations hereunder, and (ii) it has not entered into any agreement inconsistent with this Agreement or otherwise granted any third party any rights inconsistent with the rights granted to the other party under this Agreement.

10.2. **Government Approvals.** Each party represents that no consent or approval of any governmental authority is required in connection with the valid execution and performance of this Agreement.

10.3. **No Other Warranties.** Except for the foregoing warranties, the company and agent make no other warranties, express or implied, by statute or otherwise, relating to the subject matter of this agreement. The company expressly disclaims any implied warranties of merchantability or fitness for a particular purpose of the products.

10.4. **No Consequential Damages.** In no event shall either party be liable to the other for any costs of procurement of substitute goods or services, loss of use, interruption of business, lost profits or her or any consequential, special, incidental, or indirect damages of any kind under any cause or action (including negligence), whether or not the first party has been advised of the possibility of such damages. These limitations shall apply notwithstanding the failure of the essential purpose of any limited remedy.

10.5. **Limitation of Damages.** Except as specifically otherwise provided in this agreement, the company's total liability for damages in connection with this agreement, whether in an action in contract or tort or any other form of action, shall be for any unpaid commissions under section 4 or 9 above.

## 11. Confidentiality

Agent acknowledges that by reason of his or her relationship to the Company hereunder, Agent will have access to certain information and materials concerning the Company's business, plans, customers, technology, and products that are confidential and of substantial value to the Company, which value would be impaired if such information were disclosed to third parties. Agent agrees not to disparage the Company, Principals, Company Employees, or Company subsidiaries at any time. Agent agrees that it shall not use in any way for his or her own account or the account of any third party, nor disclose to any third party, any such confidential information revealed to it by the Company.

Agent shall take every reasonable precaution to protect the confidentiality of such information. Upon request by Agent, the Company shall advise whether or not it considers any particular information or materials to be confidential. Agent shall not publish any technical description of the Products beyond the description published by the Company. In the event of termination of this Agreement, there shall be no use or disclosure by Agent of any confidential information of the Company, and Agent shall not manufacture or have manufactured any devices, components or assemblies utilizing the Company's patents, inventions, copyrights, know-how or trade secrets.

## 12. Trademarks and Trade Names

12.1. **Use.** During the term of this Agreement, Agent shall have the right to indicate to the public that it is an authorized Agent of the Company's Products and to advertise such Products under the trademarks, marks, and trade names that the Company may adopt from time to time (the "Company Trademarks"). Nothing herein shall grant Agent any right, title or interest in the Company Trademarks. At no time during or after the term of this Agreement shall Agent challenge or assist others to challenge the Company Trademarks or the registration thereof or attempt to register any trademarks, marks or trade names confusingly similar to those of the Company.

12.2. **Approval of Representations.** All representations of the Company's Trademarks that Agent intends to use shall first be submitted to the Company for approval (which may be approved or withheld at Company's sole and absolute discretion) of design, color, and other details or shall be exact copies of those used by the Company. If any of the Company Trademarks are to be used in conjunction with another trademark on or in relation to the Products, the Company mark shall be presented equally legibly, equally prominently, and of greater size than the other but nevertheless separated from the other so that each appears to be a mark in his or her own right, distinct from the other mark.

## 13. Indemnification

13.1. **By Agent.** Agent shall be solely responsible for, and shall indemnify and hold the Company harmless from any and all claims, damages or lawsuits (including reasonable attorneys' fees) arising out of unauthorized or negligent acts of Agent, including, without limitation, claims by third parties against the Company as a result of Agent's (i) representation of the Products in a manner inconsistent with the Company's published Products descriptions and warranties, or (ii) use or Agent of the Products inconsistent with the terms of this Agreement.

13.2. **By the Company.** The Company shall indemnify and hold harmless Agent from any and all claims, damages or lawsuits (including reasonable attorneys' fees) brought against Agent to the extent based on a claim that (i) a Product supplied by the Company, when used or distributed as provided for by this Agreement infringes any United States trade secret, or patent or (ii) a defect in the design or manufacture of the Product caused the death of or injury to a person; provided, that Agent notifies the Company promptly in writing of the claim, provides reasonable assistance in connection with the defense and/or settlement thereof, at the Company's expense, and permits or her the Company to control the defense and/or settlement thereof. The Company shall have no liability if the alleged infringement is caused by (i) use of a Product for which the Company has provided the Agent with modifications or substitute Products if use of such modifications or

Exhibit A
Page 106

substitute Products would have prevented the claim, (ii) any combination of such Product with non-Company materials or technology, where such Product alone would not have given rise to the claim, or (iii) modifications to the Product, other than modifications made by the Company.

## 14. **Non-solicitation**

Company and Agent mutually agree that during the Term and for a period of twelve months following the termination or expiration of this Agreement, they shall not make any solicitation to employ the other's employees, officers, managers and personnel, without the written consent of the other. For the purposes of this Section, a general advertisement or notice of a job listing or opening or other similar general publication of a job search or availability to fill employment positions, including on the internet, shall not be construed as a solicitation or inducement, and the hiring of any such employees or independent contractor who freely responds thereto shall not be a breach of this Section.  The Agent shall also be refrained and barred from soliciting the representation of the Company's relationships with any manufacturers, affiliates, providers or other relationships disclosed by Company.

## 15. **Miscellaneous**

15.1. **Amendments and Waivers.** Any term of this Agreement may be amended or waived only with the written consent of the parties or their respective permitted successors and assigns. Any amendment or waiver affected in accordance with this Section shall be binding upon the parties and their respective successors and assigns.

15.2. **Successors and Assigns.** A mutually agreed consideration for Company's entering into this Agreement is the reputation, business standing, and goodwill already honored and enjoyed by Agent, and, accordingly, Agent agrees that his or her rights and obligations under this Agreement may not be transferred or assigned to any person or entity directly or indirectly without the prior written consent of the Company. Subject to the foregoing, terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

15.3. **Governing Law; Jurisdiction.** This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Colorado, without giving effect to principles of conflicts of law. Each of the parties to this Agreement consents to the exclusive jurisdiction and venue of the courts of the State and federal courts of Colorado.

15.4. **Attorney's Fees.** If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

15.5. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

15.6. **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

15.7. **Notices.** Any notice or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, or forty-eight (48) hours after being deposited in the regular mail as certified or registered mail with the postage pre-paid, if such notice is addressed to the party to be notified at such party's address or facsimile number as set forth below, or as subsequently modified by written notice.

15.8. **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each party as close as possible to that under the provision rendered unenforceable. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable  in accordance with his or her terms.

15.9. **Entire Agreement.** This Agreement is the product of both of the parties hereto and constitutes the entire agreement between such parties pertaining to the subject matter hereof and merges all prior negotiations and drafts of the parties with regard to the transactions contemplated herein. Any and all other written or oral agreements existing between the parties hereto regarding such transactions are expressly canceled.

- *Signature Page Follows –*

**FOR COMPANY:**

By:_____

Printed Name: Jim Pollak

Title**:** CEO

**Address for Notices:**

10400 Spring Green Dr., Suite 112

Englewood, CO 80112

Phone: 720.339.3694

Email: jpollak@progressmedicalllc.com

**FOR AGENT:**

By:_____

Printed Name:_____

 Title:_____

**Address for Notices:**

_____

_____

Phone:_____

Email:_____

Date Signed:_____

# EXHIBIT A Q2

| | |
|---|---|
| ActiGraft | 10% |
| AmnioAMP -MP | 15% |
| Amnio-Maxx | 15% |
| AmnioWrap² | 10% |
| bioConneKt | 10% |
| Complete AA, Complete SL, MOST | 10% |
| DermaBind FM | 15% |
| DermaBind TL | 15% |
| Membrane Wrap and Membrane Wrap Hydro | 15% |
| PalinGen Membrane | 15% |
| SimpliMax | 15% |
| Vendaje AC | 10% |
| Xcell Amnio Matrix | 15% |
| Wharton's Jelly & Exosome Injectables | 15% |
| Wound Dressings | 15% |

## Progress Medical Referral Program

MedXPrime referral fee is based on the above table, calculated on net dollars collected

**\*\*\* Company is in the process of evaluating additional products for its portfolio and this exhibit may be updated from time to time as new products are onboarded. \*\*\***

*confidential*

Exhibit A
Page 110

# Exhibit B

*U.S., et al., ex rel. Wadhwa, et al.*
*v. Progress Medical LLC, et al.*
(filed under seal)

Exhibit B
Page 111

## <u>NON-EXCLUSIVE SALES AGENT AND PERSONAL SERVICES AGREEMENT</u>

This Non-Exclusive Sales Agent and Personal Services Agreement (the "Agreement"), effective this day of _____, (the "Effective Date"), is made and entered into by and between the below-listed Agent and Company.

**SALES AGENT:**   _____(the "Agent"), whose address is:

_____

_____

**COMPANY:**   **Progress Medical LLC** (the "Company"), with its head office located at:
**10400 Spring Green Dr., Suite 112**
**Englewood, CO 80112**

## <u>RECITALS</u>

WHEREAS, Company wishes to appoint Agent as its non-exclusive Agent for Products (as defined below); and

WHEREAS, Agent has represented to Company that he or she has the facilities, and expertise required for the successful marketing of the Products and wishes to act as Company's Agent for the Products; and

WHEREAS, Agent agrees to provide certain personal services, including marketing and sales consultation with end users of Company products.

NOW, THEREFORE, in consideration of the foregoing and the promises, representations, and warranties set forth below, the parties agree as follows:

## **AGREEMENT**

In consideration of the foregoing and of the mutual promises contained in this Agreement, the parties agree as follows:

## 1. <u>Definitions</u>

1.1. **"Products"** shall mean those products listed in Exhibit A attached to this Agreement. Products may be changed, abandoned or added by Company, in its sole discretion, anytime. Company shall be under no obligation to continue production of any Product.

1.2. **"Confidential Information"** means all data and information of a confidential and proprietary nature, including any proprietary information, technical data, trade secrets or knowhow, including, but not limited to, research, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information of Company communicated, orally, electronically, or in writing, to Agent and identified by Company as confidential, whether or not designated in writing as such.

## 2. Appointment and Authority of Agent

2.1. **Non-Exclusive Agent.** Subject to the terms and conditions of this Agreement, the Company hereby appoints Agent as a Company's Non-Exclusive Agent for the Products, and Agent hereby accepts such appointment. Agent's sole authority shall be to solicit orders for the Products in accordance with all applicable laws, rules, regulations, and the terms of this Agreement. Agent shall not have the authority to make any commitments whatsoever on behalf of the Company.

2.2. **Independent Contractors.** The relationship of the Company and Agent established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the parties as partners, co-owners or otherwise as participants in a joint undertaking, or (iii) allow Agent to create or assume any obligation on behalf of the Company for any purpose whatsoever. All financial and other obligations associated with Agent's business are the sole responsibility of Agent. Agent shall be solely responsible for, and shall indemnify and hold the Company free and harmless from, any and all claims, damages or lawsuits (including the Company's attorneys' fees) arising out of unauthorized, illegal, unethical, or negligent acts of Agent/Agent.

## 3. Obligations of the Parties

3.1. **General Conduct of Agent.** Agent shall use his or her best efforts to legally promote and sell the Products, and shall, at his or her sole cost, expense, and risk: (i) maintain suitable organization for and use his or her best efforts to actively promote and sell the Company's Products. Exhibit A lists the Products and the MSRP for each product.

3.2. **Training.** Agent agrees to promote the Product only for use by physicians, or other healthcare providers legally allowed to use such products. Education, and/or training will be offered by the Company.

3.3. **Notification.** During the term of this Agreement, if Agent becomes aware of any use or attempted use of the Products by anyone who is not trained as described herein, then Agent will promptly notify Company of such use and will promptly disclose all facts, circumstance, and knowledge of such use to Company.

3.4. **Forecasts.** Agent shall meet with Company at agreed upon times to discuss sales and marketing activities and to provide a forecast of anticipated sales.

3.5. **Performance of Obligations** Agent understands, acknowledges, and agrees that the continued maintenance of an image of excellence and a high level of ethical marketing of the Products is essential to the continued success of both parties hereto. Accordingly, Agent hereby agrees that he or she shall, at all times: (i) conduct business in a manner that reflects favorably on the Products, good name, goodwill, and reputation of Company; (ii) avoid deceptive, misleading, or unethical practices that are or might be detrimental to Company, the Product, or the public; (iii) make no false or misleading representations, either orally or in any written materials, with regard to Company or the Product, using only Company-approved claims in all advertising, publicity and marketing materials (**Company has a zero-tolerance for any off-label promotion by any Agent**); (iv) not publish or employ, or cooperate in the publication or employment of, any misleading or deceptive advertising material with regard to Company or the Product; (v) make no representations, warranties, or guarantees to customers or to the trade with respect to the specifications, indications, capabilities, or features of the Product that are inconsistent with the literature distributed by Company; (vi) not enter into any contract or engage in any practice detrimental to the interests of Company or the Product; (vii) Agent is required to act in the best interest of the Company at all times and in all interactions or encounters. Violation of any of the provisions of this Section shall constitute a material breach of this agreement.

3.6. **Compliance.** Agent shall at all times during the term of this Agreement strictly comply with all applicable regulatory laws governing the Agent, promotion, marketing, training and sale of the Product, including compliance with all applicable regulatory standards. Such compliance shall include, but shall not be limited to, the following duties:

3.6.1. Except as provided below, Company shall be responsible for applicable medical products regulatory approvals as required by law;

3.6.2. Agent agrees not to sell or distribute the Product in any geographical area which requires a license or approval until such time as appropriate licenses or approvals have been obtained;

3.6.3. Agent agrees to receive notifications from his or her customers or any applicable physician or healthcare practitioner regarding complaints and adverse events with respect to the Product marketed by Agent. Agent shall, within forty-eight (48) hours, or as soon as possible, of receipt of such notification, provide Company with all necessary information required by Company;

3.6.4. Agent shall forward to physicians or healthcare providers any required communications or notifications originated by, and at the request of, the Company. Agent shall provide written confirmation of having delivered such requested communications or notifications to physicians within a reasonable period of time subsequent to delivery;

3.6.5. Agent shall provide all personal services identified in this Agreement or requested by Company;

3.6.6. Agent is required to exclusively use Company-issued marketing materials and assets; and

3.7. **Marketing Materials.** Company will provide a digital copy of standard English language marketing or promotion materials to Agent to be used in Product sales efforts by Agent. Agent

shall use only marketing materials which are provided by Company.  Any proposed changes to any marketing material must be provided to Company for prior-approval.

3.8. **Availability of Products.** Company reserves the right at any time to discontinue the manufacture, supply, or sale of the Product, and subject to appropriate regulatory approvals, to make changes in materials or design to the Product. Products may be upgraded, enhanced, changed, abandoned or added by Company, at its sole discretion.

3.9. **Sales to U.S. Institutions and Agencies.** Sales to US government institutions, subsidiaries, contractors or agents is only permitted on a case by case basis and when written approval has been granted by company.

3.10. **Additional Responsibilities.** It is hereby agreed by the parties hereto that each of them is entering into this Agreement based on his or her own capacities, resources, and abilities. Therefore, Company will not be responsible for the non-compliance of Agent's obligations and duties. Similarly, Agent will not be responsible for the noncompliance of Company' obligations and duties pursuant to this Agreement. Each party will pay any costs and expenses incurred during the performance of his or her respective obligations under this Agreement.

## 4. Compensation

4.1. **Sole Compensation - Company Billing.** Agent's sole compensation under the terms of this Agreement shall be a commission computed in accordance with the methodology set forth in Exhibit A attached to this Agreement. The commission shall apply to all orders solicited by the Agent that have been accepted by the Company and for which a valid purchase order has been received. Commissions shall be computed on the net amount billed by the Company to the customer, and no commission shall be paid with respect to charges for handling, freight, sales taxes, C.O.D. charges, insurance, import duties, trade discounts, repairs, and other similar charges and expenses. All commissions for sales from a calendar month shall be paid by the 15th of the following month if payment has been received from provider/customer.

4.2. **Monthly Statements.** The Company shall provide the Agent access monthly reports for the agent to inspect what items their client has ordered.

## 5. Sale of the Products

5.1. **Prices and Terms of Sale.** The Company shall provide Agent with copies of his or her current price lists, his or her delivery schedules, and his or her standard terms and conditions of sale, as established from time to time. Agent shall not quote to customers any prices below the MSRP without expressed written consent from Company.

5.2. **Price Changes.** The Company may alter at will the prices, delivery schedules, and terms and conditions, provided only that it gives prior written notice to Agent of any changes. Each ordershall be governed by the prices, delivery schedules, and terms and conditions in effect at the time the order is accepted, and all quotations made to customers by Agent shall contain a statement to that effect.

5.3. **Quotations.** Upon request of the Company and if applicable, Agent shall, within five (5) days of submission, furnish to Company copies of all quotations submitted to customers. Each quotation shall be consistent with the terms of this Agreement.

5.4. **Acceptance.** All orders obtained by Agent shall be subject to acceptance by the Company at its principal office currently located at the address listed for the Company in this Agreement. Agent shall have no authority to make any acceptance or delivery commitments to customers. The Company specifically reserves the right to reject any

## 6. Product Warranty and Product Availability

6.1. **Product Warranty.** Any warranty for the Products shall run directly from the Company to the customer, and pursuant to the warranty the customer shall return any allegedly defective Products directly to the Company. Agent shall have no authority to accept any returned Products or to make any warranties with respect to the Products.

6.2. **Product Availability.** Under no circumstances shall the Company be responsible to Agent or any other party for its failure to fill accepted orders, or for its delay in filling accepted orders.

## 7. Additional Responsibilities of Agent

7.1. **Forecasts.** Upon request of the Company, within the first five (5) days of each month as an Agent; Agent shall provide the Company with a thirty (30) day rolling forecast of orders.

7.2. **Promotion of the Products.** Agent shall, at his or her own expense, perform the personal services set forth herein, and legally promote the sale of and stimulate demand for the Products by direct solicitation. Agent agrees that any and all promotion shall be in accordance with the Products' AATB Guidelines. In no event shall Agent make any representation, guarantee or warranty concerning the Products except as expressly authorized by the Company.

7.3. **Customer Service.** Agent shall diligently assist the customers' personnel in using the Products and shall perform such additional customer services as required by customer, and as the Company may reasonably request, consistent with the personal services nature of this Agreement.

7.4. **Advising of Changes.** Agent shall promptly advise the Company of (i) any material changes in Agent's status (ii) any political, financial, legislative, industrial or other events that could affect the mutual business interests of Agent and the Company, whether harmful or beneficial.

7.5. **Expense of Doing Business.** Agent shall bear the entire cost and expense of conducting his or her business in accordance with the terms of this Agreement.

7.6. **Tracking.** Company shall maintain a detailed tracking system enabling Agent to track Product by customer or physician name and address.

7.7. **Communication with Manufacturers.** Agent at no time shall communicate directly with Company's manufacturers. This is considered a direct violation of the Agreement and resulting in immediate termination with cause.

**8.** **Additional Obligations of the Company**

8.1. **Assistance in Promotion.** The Company shall provide Agent with digital marketing and technical information concerning the Products as well as reasonable quantities of brochures (if available), instructional material, advertising literature and other Product data. Agent is required to exclusively use these materials.

8.2. **Assistance in Problems.** The Company agrees to assist Agent and his or her customers in all ways deemed reasonable by Company in the solution of any problems relating to the functioning and use of the Products.

8.3. **Training and Education.** Agent shall complete training sessions held by the Company with permission of the Company. Agent shall be responsible, unless express consent is given from the Company, for expenses incurred to attend training sessions, including, but not limited to, travel and accommodations.

8.4. **New Developments.** The Company agrees to keep Agent informed of any improvements or enhancements to the Products which become commercially available.

**9.** **Term and Termination**

9.1. **Term.** The term of this Agreement shall commence on the Effective Date and shall continue in effect for an initial term of one (1) year, (the "Term"), unless earlier terminated as set forth herein. Thereafter, this contract shall renew for successive one (1) year terms unless terminated by either party.

9.2. **Termination for Cause or No Cause or "Off-Label" Promotion.** If either party defaults in the performance of any provision of this Agreement, then the non-defaulting party may give immediate written notice to the defaulting party that the Agreement is terminated. Company is under no obligation to pay commissions or overrides to Agent if agent is terminated for Cause. All overrides terminate along with termination of agreement.

9.3. **Termination for Insolvency.** This Agreement shall terminate, without notice, (i) upon the institution by or against Agent for insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Agent's debts, (ii) upon Agent's making an assignment for the benefit of creditors, or (iii) upon Agent's dissolution.

9.4. **Return of Materials.** All trademarks, trade names, patents, copyrights, designs, drawings, formulas or other data, photographs, demonstration units or, literature, and sales aids of every kind shall remain the property of the Company. Within fifteen (15) days after the termination of this Agreement, Agent shall prepare all such items in his or her possession for shipment, as the Company may direct, and ship to the Company at the Company's expense. Agent shall not make or retain any copies of any confidential items or information that may have been entrusted to him or her. Effective upon the termination of this Agreement, Agent shall cease to use all trademarks, marks, and trade names of the Company.

9.5. **Limitation on Liability.** In the event of termination by either party in accordance with any of the provisions of this agreement, neither party shall be liable to the other, because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or her or anticipated sales or on account of expenditures, investments, leases or commitments in connection with the business or goodwill of the company or agent. The company's sole liability under the terms of this agreement shall be for any unpaid commissions under this Agreement.

9.6. **Survival of Certain Terms.** The provisions of Sections 10, 11, 13, 14, and any provision regarding enforcement or breach of this Agreement, including any damages or attorney's fees, shall survive the termination of this Agreement. All other rights and obligations of the parties shall cease upon termination of this Agreement.

## 10. Warranties; Limitation on Liability

10.1. **Power and Authority.** Each party represents and warrants that (i) it has the full right, power and authority to enter into this Agreement and to perform his or her obligations hereunder, and (ii) it has not entered into any agreement inconsistent with this Agreement or otherwise granted any third party any rights inconsistent with the rights granted to the other party under this Agreement.

10.2. **Government Approvals.** Each party represents that no consent or approval of any governmental authority is required in connection with the valid execution and performance of this Agreement.

10.3. **No Other Warranties.** Except for the foregoing warranties, the company and agent make no other warranties, express or implied, by statute or otherwise, relating to the subject matter of this agreement. The company expressly disclaims any implied warranties of merchantability or fitness for a particular purpose of the products.

10.4. **No Consequential Damages.** In no event shall either party be liable to the other for any costs of procurement of substitute goods or services, loss of use, interruption of business, lost profits or her or any consequential, special, incidental, or indirect damages of any kind under any cause or action (including negligence), whether or not the first party has been advised of the possibility of such damages. These limitations shall apply notwithstanding the failure of the essential purpose of any limited remedy.

10.5. **Limitation of Damages.** Except as specifically otherwise provided in this agreement, the company's total liability for damages in connection with this agreement, whether in an action in contract or tort or any other form of action, shall be for any unpaid commissions under section 4 or 9 above.

## 11. Confidentiality

Agent acknowledges that by reason of his or her relationship to the Company hereunder, Agent will have access to certain information and materials concerning the Company's business, plans, customers, technology, and products that are confidential and of substantial value to the Company, which value would be impaired if such information were disclosed to third parties. Agent agrees not to disparage the Company, Principals, Company Employees, or Company subsidiaries at any time. Agent agrees that it shall not use in any way for his or her own account or the account of any third party, nor disclose to any third party, any such confidential information revealed to it by the Company.

Agent shall take every reasonable precaution to protect the confidentiality of such information. Upon request by Agent, the Company shall advise whether or not it considers any particular information or materials to be confidential. Agent shall not publish any technical description of the Products beyond the description published by the Company. In the event of termination of this Agreement, there shall be no use or disclosure by Agent of any confidential information of the Company, and Agent shall not manufacture or have manufactured any devices, components or assemblies utilizing the Company's patents, inventions, copyrights, know-how or trade secrets.

## 12. Trademarks and Trade Names

12.1. **Use.** During the term of this Agreement, Agent shall have the right to indicate to the public that it is an authorized Agent of the Company's Products and to advertise such Products under the trademarks, marks, and trade names that the Company may adopt from time to time (the "Company Trademarks"). Nothing herein shall grant Agent any right, title or interest in the Company Trademarks. At no time during or after the term of this Agreement shall Agent challenge or assist others to challenge the Company Trademarks or the registration thereof or attempt to register any trademarks, marks or trade names confusingly similar to those of the Company.

12.2. **Approval of Representations.** All representations of the Company's Trademarks that Agent intends to use shall first be submitted to the Company for approval (which may be approved or withheld at Company's sole and absolute discretion) of design, color, and other details or shall be exact copies of those used by the Company. If any of the Company Trademarks are to be used in conjunction with another trademark on or in relation to the Products, the Company mark shall be presented equally legibly, equally prominently, and of greater size than the other but nevertheless separated from the other so that each appears to be a mark in his or her own right, distinct from the other mark.

## 13. Indemnification

13.1. **By Agent.** Agent shall be solely responsible for, and shall indemnify and hold the Company harmless from any and all claims, damages or lawsuits (including reasonable attorneys' fees) arising out of unauthorized or negligent acts of Agent, including, without limitation, claims by third parties against the Company as a result of Agent's (i) representation of the Products in a manner inconsistent with the Company's published Products descriptions and warranties, or (ii) use or Agent of the Products inconsistent with the terms of this Agreement.

13.2. **By the Company.** The Company shall indemnify and hold harmless Agent from any and all claims, damages or lawsuits (including reasonable attorneys' fees) brought against Agent to the extent based on a claim that (i) a Product supplied by the Company, when used or distributed as provided for by this Agreement infringes any United States trade secret, or patent or (ii) a defect in the design or manufacture of the Product caused the death of or injury to a person; provided, that Agent notifies the Company promptly in writing of the claim, provides reasonable assistance in connection with the defense and/or settlement thereof, at the Company's expense, and permits or her the Company to control the defense and/or settlement thereof. The Company shall have no liability if the alleged infringement is caused by (i) use of a Product for which the Company has provided the Agent with modifications or substitute Products if use of such modifications or

Exhibit B
Page 119

substitute Products would have prevented the claim, (ii) any combination of such Product with non-Company materials or technology, where such Product alone would not have given rise to the claim, or (iii) modifications to the Product, other than modifications made by the Company.

## 14. Non-solicitation

Company and Agent mutually agree that during the Term and for a period of twelve months following the termination or expiration of this Agreement, they shall not make any solicitation to employ the other's employees, officers, managers and personnel, without the written consent of the other. For the purposes of this Section, a general advertisement or notice of a job listing or opening or other similar general publication of a job search or availability to fill employment positions, including on the internet, shall not be construed as a solicitation or inducement, and the hiring of any such employees or independent contractor who freely responds thereto shall not be a breach of this Section. The Agent shall also be refrained and barred from soliciting the representation of the Company's relationships with any manufacturers, affiliates, providers or other relationships disclosed by Company.

## 15. Miscellaneous

15.1. **Amendments and Waivers.** Any term of this Agreement may be amended or waived only with the written consent of the parties or their respective permitted successors and assigns. Any amendment or waiver affected in accordance with this Section shall be binding upon the parties and their respective successors and assigns.

15.2. **Successors and Assigns.** A mutually agreed consideration for Company's entering into this Agreement is the reputation, business standing, and goodwill already honored and enjoyed by Agent, and, accordingly, Agent agrees that his or her rights and obligations under this Agreement may not be transferred or assigned to any person or entity directly or indirectly without the prior written consent of the Company. Subject to the foregoing, terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

15.3. **Governing Law; Jurisdiction.** This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Colorado, without giving effect to principles of conflicts of law. Each of the parties to this Agreement consents to the exclusive jurisdiction and venue of the courts of the State and federal courts of Colorado.

15.4. **Attorney's Fees.** If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

15.5. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

15.6. **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

15.7. **Notices.** Any notice or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, or forty-eight (48) hours after being deposited in the regular mail as certified or registered mail with the postage pre-paid, if such notice is addressed to the party to be notified at such party's address or facsimile number as set forth below, or as subsequently modified by written notice.

15.8. **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each party as close as possible to that under the provision rendered unenforceable. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable  in accordance with his or her terms.

15.9. **Entire Agreement.** This Agreement is the product of both of the parties hereto and constitutes the entire agreement between such parties pertaining to the subject matter hereof and merges all prior negotiations and drafts of the parties with regard to the transactions contemplated herein. Any and all other written or oral agreements existing between the parties hereto regarding such transactions are expressly canceled.

- *Signature Page Follows* –

**FOR COMPANY:**                                    **FOR AGENT:**

By:_____    By:_____

Printed Name: Jim Pollak                      Printed Name:_____

Title**:** CEO                                      Title:_____

**Address for Notices:**                            **Address for Notices:**

10400 Spring Green Dr., Suite 112                   _____

Englewood, CO 80112                                 _____

Phone: 720.339.3694                           Phone:_____

Email: jpollak@progressmedicalllc.com         Email:_____

                                              Date Signed:_____

# EXHIBIT A

| |
|---|
| ActiGraft |
| AmnioAMP -MP |
| bioConneKt |
| Cocoon Membrane |
| Complete ACA |
| DermaBind FM |
| DermaBind TL |
| Membrane Wrap and Membrane Wrap Hydro |
| Samaritan Skin Substitutes (Complete AA) |
| SimpliMax |
| XCell Amnio Matrix |
| Wharton's Jelly & Exosome Injectables |
| Wound Dressings |
| Physician Office Lab |

**Progress Medical Referral Program**
10% referral fee for all products sold to accounts introduced by MedXPrime
The referral fee is calculated from collected net dollars.

**\*\*\* Company is in the process of evaluating additional products for its portfolio and this exhibit may be updated from time to time as new products are onboarded. \*\*\***

*confidential*

# Exhibit C

*U.S., et al., ex rel. Wadhwa, et al.*
*v. Progress Medical LLC, et al.*
(filed under seal)

Exhibit C
Page 124

**Progress Medical**

**Health is Precious-Protect it!**

# PROGRESS MEDICAL WOUND CARE PORTFOLIO

| Product | Description | | Invoice Price |
|---|---|---|---|
| MOST Q4328 | Perforated Triple Layer, Amnion/Chorion/Amnion CMS ASP | Net 45 | $3,710 |
| DermaBind FM Q4313 | Amniotic Triple Layer, Amnion/Spongy Layer/Chorion CMS ASP | Net 45 | $3,337 |
| AmnioAMP-MP Q4250 | Amniotic Triple Layer CMS ASP | Net 45 | $2,863 |
| Cocoon Membrane Q4264 | Amniotic Multi-Layer Cross Linked Fee Schedule (First Coast, Novitas) | Net 45 | $2,781 |
| DermaBind TL Q4225 | Amniotic Triple Layer, Amnion/Spongy Layer/Chorion CMS ASP | Net 45 | $1,387 |
| SimpliMax Q4341 | Amniotic Dual Layer Fee Schedule (First Coast, Novitas) | Net 45 | $3,631 |
| Complete AA Q4303 | Amniotic Dual Layer CMS ASP | Net 45 | $3,397 |
| Amnio-Maxx Q4239 | Amniotic Dual Layer CMS ASP | Net 45 | $2,350 |
| Membrane Wrap Hydro Q4290 | Amniotic Dual Layer Suspended in Amniotic Fluid CMS ASP | Net 45 | $1,841 |
| Membrane Wrap Q4205 | Amniotic Dual Layer CMS ASP | Net 45 | $1,056 |
| Complete SL Q4270 | Amniotic Single Layer CMS ASP | Net 45 | $3,371 |
| Xcell Amnio Matrix Q4280 | Lyophilized Single Layer CMS ASP | NET 45 | $3,246 |
| PalinGen Membrane Q4173 | Amniotic Single or Dual Layer CMS ASP | Net 45 | $360 |
| BioConneKt Matrix Q4161 | FDA 510K Equine Collagen CMS ASP | Net 45 | $1,854 |
| ActiGraft Plus G0465 | Autologous Blood Derived Therapy Medicare Advantage covers all diabetic patients | Net 30 | Avg. per Appl. $890 |

**855.832.2897 | info@progressmedicalllc.com | www.progressmedicalllc.com**

Exhibit C
Page 125

# Exhibit D

*U.S., et al., ex rel. Wadhwa, et al.*
*v. Progress Medical LLC, et al.*
(filed under seal)

Exhibit D
Page 126

| Units | Q2 | | | 10% |
|---|---|---|---|---|
| **1** | | | | **15%** |
| **Units** | **Skin Graft** | **Invoice Price** | **Discount Price** | **MedXPrime** |
| 1 | Simplimax | $3,631.00 | $2,178.60 | $326.79 |
| 1 | DermaBind FM ASP | $3,337.23 | $2,002.34 | $300.35 |
| 1 | XCell Amnio Matrix ASP | $3,246.05 | $1,947.63 | $292.14 |
| 1 | AmnioAMP-MP ASP | $2,863.13 | $1,717.88 | $257.68 |
| 1 | MOST ASP | $3,710.00 | $2,411.50 | $241.15 |
| 1 | Complete AA ASP | $3,397.40 | $2,208.31 | $220.83 |
| 1 | Complete SL ASP | $3,370.80 | $2,191.02 | $219.10 |
| 1 | Amnio-Maxx ASP | $2,349.92 | $1,409.95 | $211.49 |
| 1 | MW Hydro ASP | $1,841.00 | $1,104.60 | $165.69 |
| 1 | AmnioWrap2 | $2,014.00 | $1,309.10 | $130.91 |
| 1 | DermaBind TL ASP | $1,387.09 | $832.25 | $124.84 |
| 1 | Bio-ConneKt | $1,853.66 | $1,200.00 | $120.00 |
| 1 | MW ASP | $1,055.97 | $633.58 | $95.04 |
| 1 | ActiGraft Plus | $890.00 | $534.00 | $53.40 |
| 1 | PalinGen Membrane ASP | $360.51 | $216.30 | $32.45 |

| Units | Q2 | | | 10% |
|---|---|---|---|---|
| **5000** | | | | **15%** |
| **Units** | **Skin Graft** | **Invoice Price** | **Discount Price** | **MedXPrime** |
| 5000 | Simplimax | $18,155,000.00 | $10,893,000.00 | $1,633,950.00 |
| 5000 | DermaBind FM ASP | $16,686,150.00 | $10,011,690.00 | $1,501,753.50 |
| 5000 | XCell Amnio Matrix ASP | $16,230,250.00 | $9,738,150.00 | $1,460,722.50 |
| 5000 | AmnioAMP-MP ASP | $14,315,650.00 | $8,589,390.00 | $1,288,408.50 |
| 5000 | MOST ASP | $18,550,000.00 | $12,057,500.00 | $1,205,750.00 |
| 5000 | Complete AA ASP | $16,987,000.00 | $11,041,550.00 | $1,104,155.00 |
| 5000 | Complete SL ASP | $16,854,000.00 | $10,955,100.00 | $1,095,510.00 |
| 5000 | Amnio-Maxx ASP | $11,749,600.00 | $7,049,760.00 | $1,057,464.00 |
| 5000 | MW Hydro ASP | $9,205,000.00 | $5,523,000.00 | $828,450.00 |
| 5000 | AmnioWrap2 | $10,070,000.00 | $6,545,500.00 | $654,550.00 |
| 5000 | DermaBind TL ASP | $6,935,450.00 | $4,161,270.00 | $624,190.50 |
| 5000 | Bio-ConneKt | $9,268,300.00 | $6,000,000.00 | $600,000.00 |
| 5000 | MW ASP | $5,279,850.00 | $3,167,910.00 | $475,186.50 |
| 5000 | ActiGraft Plus | $4,450,000.00 | $2,670,000.00 | $267,000.00 |
| 5000 | PalinGen Membrane ASP | $1,802,540.00 | $1,081,524.00 | $162,228.60 |

# Exhibit E

*U.S., et al., ex rel. Wadhwa, et al.*
*v. Progress Medical LLC, et al.*
(filed under seal)

Exhibit E
Page 128

# *Progress Medical Registration*



**Please submit completed Forms via:**
**Email: orders@progressmedicalllc.com or Fax: 888.965.7595**

_____          _____20_____

Rep Name                                                                            Day    Month    Year

_____

Practice Name                                Practice NPI        Practice Tax ID        PTAN

_____

Provider Name                        Provider Email        Provider NPI        Clinic Specialty

_____

Practice Address                            Suite            City                        State            Zip

_____

Practice Phone                        Practice Fax

_____

Primary Contact                        Contact Phone            Contact Email            Position

## Billing & Clinic Support Staff

_____

Biller Name                                Email                        Biller Phone

_____

Admin Name for IVR's                    Email                        Admin Phone

## Important Email Addresses

_____

Email to Receive Orders and Shipping Information

_____

Email to Receive Invoices

Exhibit E
Page 129

# BUSINESS ASSOCIATE AGREEMENT (HIPAA)

This Privacy Agreement ("Agreement"), is effective upon signing this Agreement and is entered into by and between _____ ("Covered Entity") and Progress Medical LLC (the "Business Associate").

**I. Term**. This Agreement shall remain in effect for the duration of this Agreement and shall apply to all of the Services and/or Supplies delivered by the Business Associate pursuant to this Agreement.

**II. HIPAA Assurances**. In the event Business Associate creates, receives, maintains, or otherwise is exposed to personally identifiable or aggregate patient or other medical information defined as Protected Health Information ("PHI") in the Health Insurance Portability and Accountability Act of 1996 or its relevant regulations ("HIPAA") and otherwise meets the definition of Business Associate as defined in the HIPAA Privacy Standards (45 CFR Parts 160 and 164), Business Associate shall:

(a) Recognize that HITECH (the Health Information Technology for Economic and Clinical Health Act of 2009) and the regulations thereunder (including 45 C.F.R. Sections 164.308, 164.310, 164.312, and 164.316), apply to a business associate of a covered entity in the same manner that such sections apply to the covered entity;

(b) Not use or further disclose the PHI, except as permitted by law;

(c) Not use or further disclose the PHI in a manner that had the Covered Entity done so, would violate the requirements of HIPAA;

(d) Use appropriate safeguards (including implementing administrative, physical, and technical safeguards for electronic PHI) to protect the confidentiality, integrity, and availability of and to prevent the use or disclosure of the PHI other than as provided for by this Agreement;

(e) Comply with each applicable requirements of 45 C.F.R. Part 162 if the Business Associate conducts Standard Transactions for or on behalf of the Covered Entity;

(f) Report promptly to the Covered Entity any security incident or other use or disclosure of PHI not provided for by this Agreement of which Business Associate becomes aware;

(g) Ensure that any subcontractors or agents who receive or are exposed to PHI (whether in electronic or other format) are explained the Business Associate obligations under this paragraph and agree to the same restrictions and conditions;

(h) Make available PHI in accordance with the individual's rights as required under the HIPAA regulations;

(i) Account for PHI disclosures for up to the past six (6) years as requested by Covered Entity, which shall include: (i) dates of disclosure, (ii) names of the

Exhibit E
Page 130

entities or persons who received the PHI, (iii) a brief description of the PHI disclosed, and (iv) a brief statement of the purpose and basis of such disclosure;

(j) Make its internal practices, books, and records that relate to the use and disclosure of PHI available to the U.S. Secretary of Health and Human Services for purposes of determining Customer's compliance with HIPAA; and

(k) Incorporate any amendments or corrections to PHI when notified by Customer or enter into a Business Associate Agreement or other necessary Agreements to comply with HIPAA.

**III. Termination Upon Breach of Provisions**. Notwithstanding any other provision of this Agreement, Covered Entity may immediately terminate this Agreement if it determines that Business Associate breaches any term in this Agreement. Alternatively, Covered Entity may give written notice to Business Associate in the event of a breach and give Business Associate five (5) business days to cure such breach. Covered Entity shall also have the option to immediately stop all further disclosures of PHI to Business Associate if Covered Entity reasonably determines that Business Associate has breached its obligations under this Agreement. In the event that termination of this Agreement and the Agreement is not feasible, Business Associate hereby acknowledges that the Covered Entity shall be required to report the breach to the Secretary of the U.S. Department of Health and Human Services, notwithstanding any other provision of this Agreement or Agreement to the contrary.

**IV. Return or Destruction of Protected Health Information upon Termination**. Upon the termination of this Agreement, unless otherwise directed by Covered Entity, Business Associate shall either return or destroy all PHI received from the Covered Entity or created or received by Business Associate on behalf of the Covered Entity in which Business Associate maintains in any form. Business Associate shall not retain any copies of such PHI. Notwithstanding the foregoing, in the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible upon termination of this Agreement, Business Associate shall provide to Covered Entity notification of the condition that makes return or destruction infeasible. To the extent that it is not feasible for Business Associate to return or destroy such PHI, the terms and provisions of this Agreement shall survive such termination or expiration and such PHI shall be used or disclosed solely as permitted by law for so long as Business Associate maintains such Protected Health Information.

**V. No Third-Party Beneficiaries**. The parties agree that the terms of this Agreement shall apply only to themselves and are not for the benefit of any third-party beneficiaries.

**VI. De-Identified Data**. Notwithstanding the provisions of this Agreement, Business Associate and its subcontractors may disclose non-personally identifiable information provided that the disclosed information does not include a key or other mechanism that would enable the information to be identified.

**VII. Amendment**. Business Associate and Covered Entity agree to amend this Agreement to the extent necessary to allow either party to comply with the Privacy

Exhibit E
Page 131

Standards, the Standards for Electronic Transactions, the Security Standards, or other relevant state or federal laws or regulations created or amended to protect the privacy of patient information. All such amendments shall be made in a writing signed by both parties.

**VIII. Interpretation**. Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits Covered Entity to comply with the then most current version of HIPAA and the HIPAA privacy regulations.

**IX. Definitions**. Capitalized terms used in this Agreement shall have the meanings assigned to them as outlined in HIPAA and its related regulations.

**X. Survival**. The obligations imposed by this Agreement shall survive any expiration or termination of this Agreement.

_____

**Signature** _____ Date _____

Print Name _____ Title: _____

**Progress Medical LLC**

**Signature** _____

Print Name      Jim Pollak                    Title: CEO



## Purchase Agreement

This Purchase Agreement (the "Agreement") is entered into as of this _____ day of_____, 20____ (the "Effective Date") between Progress Medical and

Customer Name: _____

Office Address: _____Suite: _____

City: _____ State: _____ Zip:_____

("Customer").

## Background

The Customer wishes to purchase, and Progress Medical has agreed to sell to Customer human cell and tissue products, subject to the following terms.

Now, therefore, the parties agree as follows:

1. **Product Prices.** Product means the human cell and tissue products offered by Progress Medical as described in Schedule A, as such Schedule A may be modified from time to time. The Invoice Price for each Product is the price stated for that Product in Schedule A.

2. **Insurance Verification.** Customer agrees to utilize Progress Medicals' Insurance Verification Request (IVR) Process. Customer will be provided with the IVR form which will be submitted to our reimbursement team and receive the authorization prior to ordering and using Products.

3. **Reimbursement Team.** Customer will utilize Progress Medical's Reimbursement team to assist with any unpaid or denied claims. Progress Medical will require a copy of the original claim and denial remit to assist in the appeal process.

4. **Order Fulfillment.** After Customer submits an IVR and receives confirmation of patient's benefits, the Customer places an order and Progress Medical accepts the order and generates an Invoice, which will reflect that the Customer has agreed to purchase the Products identified on the Invoice and the terms of the purchase. Progress Medical shall,

on the Customer's behalf, promptly pack and ship the Products identified on the Invoice for delivery to the Customer.  Progress Medical shall provide delivery status information from the carrier to the Customer for shipment.

5. **Product Usage.** After receiving Product(s), Customer will treat the patient as medically necessary. Customer and Progress Medical acknowledge that use of any Product is at the sole discretion of the treating provider, pursuant to his or her professional medical judgement.

6. **Purchase Price.** See Schedule A.

7. **Invoice & Payment.** Progress Medical will develop and deliver an Invoice to Customer that identifies the Products ordered are shipped. The customer agrees to pay Progress Medical the balance stated on each Invoice within forty-five (45) days after product shipment.  Customers will receive and pay all invoices via QuickBooks links that are emailed to the Customer.  A late charge of 1.5% will be added to invoices every month that payments are not received without proper documentation stating a claim has not been reimbursed to the provider.  Progress reserves the right to initiate legal action against the Customer for recovery of the outstanding amount and any additional costs associated with such recovery.  Progress may, at its discretion, suspend or terminate further deliveries to the Buyer until the outstanding amount, including any accrued interest, is paid in full.

8. **Product Returns.**  Customers may return Product, for full credit to their account- within thirty (30) days of its date of shipment.  Returned product must be unopened, in its original packaging-free of writing on the packaging, or any damage to the product or its packaging.  Customer must notify Progress via email with pictures of the unused product with the tissue id's visible, and Progress will supply a return label.  Progress will not accept returns past the return window.

9. **Miscellaneous.**  This Agreement contains the entire agreement between the Parties concerning the subject matter hereof and is governed by Colorado law.  Customer acknowledges that is has not made any changes to this Agreement.  To the extent any such changes exist, such changes are expressly rejected by Progress and shall have no force and effect.

**Purchase Agreement**

**Executed as of the Effective Date.**

**Customer:**                                      **Progress Medical:**

**Customer Signature:** _____  **Signature:** _____

**Customer Printed:** _____  **Jim Pollak: CEO**

Purchase Agreement

# Schedule A

| Check Below Products to Register | Product | Invoice Price per sq. cm. |
|---|---|---|
| | **Q4313 DermaBind FM**<br>**CMS ASP** | **$2,002.34** |
| | **Q4280 XCell Amnio Matrix**<br>**CMS ASP** | **$1,947.63** |
| | **Q4250 AmnioAmp-MP**<br>**CMS ASP** | **$1,717.88** |
| | **Q4239 Amnio-Maxx**<br>**CMS ASP** | **$1,409.95** |
| | **Q4290 Membrane Wrap Hydro**<br>**CMS ASP** | **$1,104.60** |
| | **Q4225 DermaBind TL**<br>**CMS ASP** | **$832.25** |
| | **Q4205 Membrane Wrap**<br>**CMS ASP** | **$633.58** |
| | **Q4173 PalinGen Membrane**<br>**CMS ASP** | **$216.30** |
| | **Q4341 SimpliMax**<br>**Fee Schedule-First Coast, Novitas** | **$2,178.60** |

**Progress Medical will send a full Schedule A for each product checked above.**
**Schedule A will include each size along with invoice price per size**

**Please send completed agreement to: orders@progressmedicalllc.com**
**or Fax: 888.965.7595**

Michael A. Hirst (CA Bar No. 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal (CA Bar No. 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
P - (530) 756-7700
F - (530) 756-7707

Counsel for Plaintiff-Relators
Sunil Wadhwa and Emily Prins

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF ILLINOIS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF TENNESSEE, AND STATE OF TEXAS <u>ex rel.</u> SUNIL WADHWA and EMILY PRINS, <br><br> Plaintiffs, <br><br> v. <br><br> PROGRESS MEDICAL LLC; AMNIO TECHNOLOGY, LLC; BIOLAB SCIENCES, INC.; BIOLAB HOLDINGS, INC.; BLS LABS, LLC; BIOSTEM TECHNOLOGIES, INC.; DIRECT BIOLOGICS, INC. f/k/a DIRECT BIOLOGICS, LLC; HEALTHTECH WOUND CARE, INC.; LEGACY MEDICAL CONSULTANTS, LP; MLM BIOLOGICS, INC.; PINNACLE TRANSPLANT TECHNOLOGIES, LLC; PRECISE BIOSCIENCE CORPORATION; REDDRESS USA, INC.; ROYAL BIOLOGICS, INC.; SAMARITAN BIOLOGICS LLC; STRATUS BIOSYSTEMS, LLC d/b/a CELLGENUITY REGENERATIVE SCIENCE; SURGENEX, LLC; XTANT MEDICAL HOLDINGS, INC.; BLS SALES AND MARKETING, LLC; WORLD REACH HEALTH, LLC; VENTURE MEDICAL LLC; AND DOES 1–20, <br><br> Defendants. | **Civil Action No:** <br><br><br> **PROOF OF SERVICE** <br><br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

Proof of Service                         137

## **PROOF OF SERVICE**

I live in the County of Yolo, State of California.  I am a citizen of the United States, over the age of eighteen (18) years, and not a party to the within action. My business address is Hirst Law Group, P.C., 200 B Street, Suite A, Davis, California, 95616.

On July 25, 2025, I served the following document(s), described as

**1. False Claims Act Complaint with Exhibits; and**

**2. Statement of Material Evidence and Information with Exhibits;**

as follows:

Hon. Pamela Bondi
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530-0001

Hon. Bilal A. Essayli
United States Attorney
Central District of California
ATTN: Civil Process Clerk
300 North Los Angeles Street, Suite 7516
Los Angeles, CA 90012

Hon. Ricardo Lara
California Insurance Commissioner
Attn: Agent for Service of Process
Government Law Bureau
300 Capitol Mall, Suite 1700
Sacramento, CA 95814

Hon. Nathan J. Hochman
Los Angeles County District Attorney
ATTN: Insurance Fraud
211 West Temple Street, Suite 1200
Los Angeles, CA 90012

Hon. Phil Weiser
Colorado Attorney General
Office of the Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203

Proof of Service                                        138

Hon. Kimberly Fox
Cook County State's Attorney
Attn: Civil Clerk
50 W. Washington St.
5th Floor, Office 500
Chicago, IL 60602

Hon. Dana Nessel
Michigan Attorney General
Michigan Department of Attorney General
P.O. Box 30212
Lansing, MI 48909

Hon. Austin Knudsen
Montana Attorney General
Montana Department of Justice
P.O. Box 201401
Helena, MT 59620-1401

Hon. Raúl Torrez
New Mexico Attorney General
Attn: Service of Process Clerk
201 3rd St. NW, Suite 300
Albuquerque, NM 87102

Hon. Letitia James
New York Attorney General
Managing Attorney's Office
Office of the New York State Attorney General
28 Liberty Street, 16th Floor
New York, NY 10005

Hon. Jonathan Skrmetti
Tennessee Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207

I placed a true and correct copy of the foregoing document(s) in a sealed envelope addressed to each interested party as set forth above. I placed each such envelope, with postage thereon fully prepaid, certified mail, and return receipt requested, for collection and mailing in one of the United States Post Offices located in Davis, California.

In addition, I served the above documents as follows:

Proof of Service                                    139

Hon. James Uthmeier
Florida Attorney General
Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Blaise Ingoglia
Florida Chief Financial Officer
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL 32399

I placed a true and correct copy of the foregoing document(s) in a sealed envelope addressed to each interested party as set forth above. I placed each such envelope, with postage thereon fully prepaid, registered mail, and return receipt requested, for collection and mailing in one of the United States Post Offices located in Davis, California.

Additionally, pursuant to consent from the recipient, I served the above documents via e-mail as follows:

Hon. Rob Bonta
California Attorney General
Office of the Attorney General
Brian V. Frankel, Supervising Deputy Attorney General
Division of Medi-Cal Fraud and Elder Abuse
brian.frankel@doj.ca.gov

Hon. Kwame Raoul
Illinois Attorney General
Office of the Attorney General
Courtney Martin
Courtney.Martin@ilag.gov

Hon. Ken Paxton
Texas Attorney General
Office of the Attorney General
Lynne Kurtz-Citrin, Deputy Chief
Healthcare Program Enforcement Division
Lynne.Kurtz-Citrin@oag.texas.gov

//

Proof of Service                              140

Finally, I submitted the above documents for personal service on the following:

Hon. Kathy Jennings
Delaware Attorney General
Delaware Department of Justice
Carvel State Building
820 N. French St.
Wilmington, DE 19801

Hon. Keith Ellison
Minnesota Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN 55101-2131

I placed a true and correct copy of the foregoing document(s) in a sealed envelope addressed to each interested party as set forth above for personal service by the sheriff of their respective counties. I placed the packets containing such envelopes, with postage thereon fully prepaid, certified mail, and return receipt requested, for collection and mailing in one of the United States Post Offices located in Davis, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 25th day of July, 2025, in Davis, California.

/s/Marisela Bernal
Marisela Bernal

Proof of Service                                    141